Judah BURSTYN, Efraim Burstyn, Adele Burstyn, and Sam Burstyn, Plaintiffs,

v.

CITY OF MIAMI BEACH, a Florida Municipal Corporation, Defendant.

No. 84–515–Civ.

United States District Court, S.D. Florida, Miami Division.

June 12, 1987.

Peter M. Siegel, and Randall C. Berg, Jr., Florida Justice Institute, Inc., Miami, Fla., for plaintiffs.

Greg M. Gaebe, Gaebe & Murphy, Coral Gables, Fla., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JAMES LAWRENCE KING, Chief Judge.

At issue in this non-jury trial are five provisions of the Miami Beach Zoning Ordinance that regulate adult congregate living facilities (ACLFs). The plaintiffs allege that the provisions are arbitrary, capricious, and unreasonable, and that they violate the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution. They seek declaratory and injunctive relief, as well as damages. The court bifurcated the damages issues and initially considered only the validity of the ordinance.

## FINDINGS OF FACT

1. ACLFs are defined in Fla.Stat. § 400.402(2) as places that undertake "to provide, for a period exceeding 24 hours, housing, food service, and one or more personal services for four or more adults, not related to the owner or administrator by blood or marriage, who require such services." Virtually the same definition appears in Miami Beach City Ordinance 83–2381.

2. Personal services are defined in Fla. Stat. § 400.402(8) as including "individual assistance with or supervision of essential activities of daily living, such as eating, bathing, grooming, dressing, and ambulating; supervision of self-administered medication; and other similar services which the [Department of Health and Rehabilitative Services] may define." Virtually the same definition appears in Miami Beach City Ordinance 83–2381.

3. ACLF residents tend to be elderly and/or to have physical or mental impairments.

4. The Burstyns challenge five provisions of the Miami Beach Zoning Ordi-

nance, which were adopted June 15, 1983, in City Ordinance 83–2381, and which are codified as Sections 28–2–A–1, 28–2–A–2, 28–2–A–3, 28–2–A–4, and 28–3–B–8. Section 28–2–A–1 limits ACLFs to buildings of no more than four stories in height; Section 28–2–A–2 prohibits ACLFs on bayfront or oceanfront property; Section 28–2–A–3 prohibits ACLFs on Ocean Drive, Collins Avenue, Ocean Terrace, Indian Creek Drive, 41st Street, Lincoln Road, and Washington Avenue; Section 28–2–A–4 places a cap of 2,000 on the number of ACLF residents in Miami Beach; and Section 28–3–B–8 provides that there should be a minimum of 1,500 foot separation between ACLFs.

5. The plaintiffs, Judah Burstyn, Efraim Burstyn, Adele Burstyn, Eileen Burstyn, and Sam Burstyn, are partners who own and operate the Blackstone Hotel and the Charles Hotel.

6. The Blackstone Hotel is located at 800 Washington Avenue, Miami Beach, Florida.

7. The Charles Hotel is located at 1475 Collins Avenue, Miami Beach, Florida.

8. The Blackstone Hotel is a twelve-story structure.

9. The Charles Hotel is a five-story structure.

10. Neither the Blackstone Hotel nor the Charles Hotel is located on bayfront or oceanfront property.

11. The present number of ACLF beds on Miami Beach is substantially less than 2,000.

12. In 1985, the Blackstone Hotel was provisionally licensed as an ACLF by the Florida Department of Health and Rehabilitative Services.

13. ACLFs, in compliance with the restrictions set out above, as well as with the other restrictions contained in Section 28 of the Miami Beach Zoning Ordinance, may be located in the following zoning districts as conditional uses: The Planned United Residential Development District; RM–060, RM–100, and RM–125 Multifamily Residential Districts; and C–1, C–2, C–3, C–4, and C–5 Commercial Districts.

14. Special use permits are to be granted for ACLFs on Miami Beach only if the mandatory requirements of Zoning Ordinance Section 28 are met, and only upon unanimous vote of the City Commission.

15. ACLFs are the only type of structures that are allowed on Miami Beach only if a special use permit is granted. All other types of structures can exist in some type of zoning district as of right.

16. The purpose the city asserts for the four-story height restriction on ACLFs is fire safety. It asserts the limitation is necessary to ensure that persons who are not fully ambulatory will be able to leave the ACLFs in the event of fire.

17. The Miami Beach Zoning Ordinance does not impose height restrictions on any types of structures other than ACLFs.

18. Neither national nor Florida fire safety standards impose any height restrictions on the basis of the ambulatoriness of the structure's residents. Indeed, height restrictions are not imposed on hospitals and nursing homes. Instead, taller buildings are simply required to have increased fire suppression mechanisms.

19. The purposes the city asserts for the oceanfront and bayfront restrictions and the named streets restrictions are (1) increasing tourism and encouraging related commercial and economic development through proper utilization of property and by removing sick and elderly people from areas frequented by tourists; (2) providing safe, pleasant surroundings for ACLF residents; and (3) furthering the desires of potential ACLF residents to be in quiet, secluded places.

20. ACLFs are the only type of residential structure expressly banned from oceanfront and bayfront areas in Miami Beach on the basis of the nature of their residents.

21. ACLFs are the only type of residential structures expressly banned from named streets in Miami Beach.

22. Only a small proportion of the elderly or ill population living on Miami Beach resides in ACLFs.

23. None of the restricted areas are zoned for tourist uses only. Other types of residential structures are allowed on oceanfront and bayfront property and on the streets named in Section 28 of the Miami Beach Zoning Ordinance.

24. Many elderly persons who, like ACLF residents, need some assistance in daily living, live in older hotels in Miami Beach. Many of these structures, which are in compliance with zoning provisions relating to hotels, are located on the streets named in the ACLF provision or on the oceanfront or bayfront. Many of those structures also exceed four stories in height.

25. Some streets where ACLFs are permitted have traffic patterns similar to streets where ACLFs are banned. For example, traffic patterns on Harding Avenue, where ACLFs are allowed, are similar to traffic patterns on Collins Avenue, where ACLFs are banned.

26. Where any finding of fact, in whole or in part, can be deemed a conclusion of law, it shall. Where any conclusion of law, in whole or in part, can be deemed a finding of fact, it shall.

## CONCLUSIONS OF LAW

This court has jurisdiction pursuant to 28 U.S.C. § 1331, since this action arises under the Constitution of the United States.

In reviewing the Miami Beach Zoning Ordinance, the court will presume its validity. *United States v. National Dairy Products Corp.*, 372 U.S. 29, 32, 83 S.Ct. 594, 597, 9 L.Ed.2d 561 (1963).

Section 28 of the Miami Beach Zoning Ordinance absolutely bars the use of the Blackstone Hotel or the Charles Hotel as ACLFs because both exceed four stories in height and both are located on prohibited streets. Under these circumstances, a use permit cannot be granted, pursuant to Section 28 of the Miami Beach Zoning Ordinance.

## EQUAL PROTECTION

■ The equal protection clause is essentially a directive to the state that persons similarly situated should be treated alike. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), *citing Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982). This constitutional directive is met when the challenged ordinance is rationally related to a legitimate governmental purpose. *Cleburne*, 473 U.S. at 439, 105 S.Ct. at 3254.

The close factual similarity between *Cleburne* and the instant case mandates that this court follow *Cleburne*. In *Cleburne*, a corporation that wished to operate a group home for the mentally retarded challenged the validity of a zoning ordinance that required a special use permit for that use. Special use permits were not required for other uses. The plaintiffs argued that the mentally retarded were a suspect class, and discriminating against the group home and its potential residents though the ordinance violated their equal protection rights.

The Supreme Court held in *Cleburne* that the mentally retarded have distinguishing characteristics relevant to some state interests and, thus, they did not form a suspect or quasi-suspect class. The court held, however, that the difference between the retarded and the general population did not support the conclusion that the city's legitimate interests were served by requiring a special use permit for group homes for the mentally retarded. The record in *Cleburne* did not support the notion that a group home would pose any special threat to the city's legitimate interests. Instead, the court concluded that the city's decision to require a special use permit was based on an irrational prejudice against the mentally retarded.

■ Just as the state can legitimately pass legislation dealing with and providing for the mentally retarded, thereby distinguishing them from others, the state also can legitimately pass statutes that recognize and deal with the differences between ACLF residents and others. Indeed, the State of Florida did just that in Fla.Stat. §§ 400.401, et seq., which define ACLFs and provides for regulation of them. Thus, heightened scrutiny of Miami Beach Zoning

Code § 28 is not called for in this case, and the court will apply the rational basis test.

■ "To withstand equal protection review, legislation that distinguishes between [one group] and others must be rationally related to a legitimate governmental purpose." *Cleburne*, 473 U.S. at 446, 105 S.Ct. at 3258. Where the legislative goals appear legitimate, the proper focus of inquiry is on the relationship between the asserted objectives of the ordinance and the means by which the governmental body chose to effectuate those objectives.[1] Upon such an inquiry, the court concludes that there is no rational relationship between the City of Miami Beach's stated goals and the four-story height restriction or the named streets restriction of Miami Beach Zoning Code § 28.

### FOUR–STORY HEIGHT RESTRICTION

■ Section 28–2–A–1 imposes a four-story height restriction on ACLFs. The city contends this restriction is rationally related to its legitimate goal of fire protection for ACLF residents. The city's fire chief recommended this restriction, based upon the fire department's rescue capabilities and the potential evacuation problems relating to elderly or infirm ACLF residents.

Fire protection is clearly a legitimate governmental interest. Where, however, the means used to carry out a legitimate goal are grossly underinclusive, the means are too attenuated to be rationally related to that goal. In this instance, the four-story height restriction for ACLFs is grossly underinclusive for the purpose of meeting the goal of promoting fire safety. No other residential use is restricted by height, including other residences housing the elderly and infirm. Neither retirement hotels nor high-rise condominiums are restricted by height, despite the fact that numerous persons who have characteristics similar to ACLF residents reside in those structures. Moreover, neither national fire

code standards nor state fire code standards place any height restrictions on any structures based on the health or ambulatoriness of the building's residents or patrons. The state ACLF statute does not require or refer to any height restriction for ACLF structures. In short, no objective evidence was introduced to support the city's position that a four-story height restriction was a rational means of promoting fire safety.

Where a legislative classification does not promote a legitimate objective of the statute, the rational basis test is not met. *Cleburne*, 473 U.S. at 446, 105 S.Ct. at 3258. A mere assertion that a recognized legitimate goal is served is not enough.

A situation similar to the four-story height restriction existed in *Cleburne*. There, a special use permit was required to operate a group home for the mentally retarded, and the city denied a permit to the plaintiff corporation, partially on the basis that the site was on a 500–year flood plain. The court stated, "This concern with the possibility of a flood ... can hardly be based on a distinction between the [proposed group] home and, for example, nursing homes, homes for convalescents or the aged, or sanitariums or hospitals, any of which could be located on the ... site without obtaining a special use permit." Likewise, in our case, the need for a four-story height restriction can hardly be based on the use of a structure as an ACLF, when other structures in the city housing similar populations have no restrictions on height.

An additional basis exists for finding the height restriction arbitrary and irrational. Proper judicial inquiry should include consideration of the treatment accorded other parcels by the government authority. *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). All ACLFs in existence on Miami Beach at the time of the adoption of Ordinance Number 83–2381 that were granted use permits were grand-

---

**1.** The recent cases of *Metropolitan Life Insurance Co. v. Ward,* 470 U.S. 869, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985), and *Cleburne* evince a trend of the court to go beyond the asserted justifications and to carefully focus on the relationship between the legislative ends and means. *See Phan v. The Commonwealth of Virginia,* 806 F.2d 516, 521 n. 6 (4th Cir.1986).

fathered in, because all had some characteristic prohibited by the ordinance. Moreover, as stated above, no other residential structures likely to house elderly or infirm citizens are restricted to four stories or less. Indeed, testimony indicated that Rebecca Towers, a low-income, high-rise condominium project housing many persons who are not fully ambulatory, and at least two hospitals on Miami Beach, are all well in excess of the four stories. Restricting the height of ACLFs is inconsistent with how the city has addressed fire safety in other situations where elderly or less mobile individuals are located. Such inconsistent treatment belies the conclusion that the city considers the four-story height restriction to be a reasonable way to promote the objective of fire safety for the elderly or infirm.

### NAMED STREETS

Section 28–2–A–3 of the ACLF ordinance prohibits ACLFs on Ocean Drive, Collins Avenue, Ocean Terrace, Indian Creek Drive, 41st Street, Lincoln Road, and Washington Avenue. The objectives advanced by the city in support of this restriction include: (1) increasing tourism and encouraging related commercial and economic development through proper utilization of property and by removing sick and elderly people from areas frequented by tourists; (2) providing safe, pleasant surroundings for ACLF residents; and (3) furthering desires of potential ACLF residents who want to be in quiet, secluded places.

■ Equal protection analysis of this provision requires a review of the evidence introduced to show whether or not the restriction was rationally related to the specific objectives asserted. Protection of retail trade and preservation of commercial districts are legitimate governmental goals. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). Similarly, encouraging tourism is a valid governmental objective. Assertion of a legitimate state goal does not end the equal protection analysis, however. The Court must focus on whether the means chosen to carry out that goal can logically further its purpose, and thus be determined rationally related. *City of Cleburne*, 473 U.S. at 446, 105 S.Ct. at 3258; *Phan v. The Commonwealth of Virginia*, 806 F.2d at 521 n. 6. Evidence of the legislative and administrative history of the ordinance at issue is particularly relevant to this determination. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

■ A careful review of the numerous public hearings, commission and planning board meetings reveals that many citizens and commissioners spoke against allowing ACLFs in particular areas of the city for fear that the elderly ACLF residents would deter shopping and discourage tourists from visiting the beach. However, no expert testimony or objective studies were presented at these meetings or hearings upon which the commissioners might reasonably conclude the existence of ACLF facilities and/or residents would negatively affect tourism or retail trade. In fact, the expert opinions were completely to the contrary. While citizen opinion is important to the planning process, unsubstantiated fear and prejudice cannot justify singling out one group for different treatment. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

■ The city also argues that the street restrictions carry out the potential ACLF residents' desire to live off the commercial streets in quiet, secluded areas. The record is entirely devoid of any evidence to support a finding that potential ACLF residents want to be secluded from the commercial districts. Rather, the hearing minutes indicate that many people implored the Commission to allow potential ACLF residents to live in the highly populated areas of the city, near shopping districts, retail services, and friends.

Originally, the planning director recommended, and the ordinance contained, a provision stating, "Facilities to be located within 1,500 feet of commercial areas." The purpose of this provision was to make it convenient for ACLF residents to access

to commercial facilities and services. After December 1982, this provision was deleted from the proposed ordinance.

Even if one were to assume that potential ACLF residents want to reside in secluded areas, there is no indication that restricting ACLFs from the particular streets listed in the ordinance will advance that goal. ACLFs are restricted from exclusively single-family zones, which would be the quietest neighborhoods. Additionally, some non-prohibited streets are as heavily trafficked and commercially oriented as the prohibited streets. Absent legislation creating a special district in a zone selected for its quiet, secluded nature, it is unlikely that ACLFs will develop away from areas of mixed commercial and residential uses. Thus, it is difficult to imagine how restricting a limited number of ACLFs from the named streets would further the stated goal of locating the elderly resident in a secluded area in any meaningful way. The goal and the existing reality of the city's development are simply too inconsistent to evidence a rational relationship between the ordinance and the asserted goal.

This same type of flawed logic applies to the stated goal of promoting tourism and preserving commercial trade. The ordinance, read in its entirety, restricts the number of ACLF facilities in Miami Beach. Accordingly, the percentage of the population that could live in ACLFs on Miami Beach is less than 5 percent of the total population. Testimony indicated that persons 65 or older account for over 50 percent of the city's population. Given these statistics, it is hard to see how restricting 5 percent of the population, probably including many elderly, is going to affect the character of the prohibited streets. The targeted group is simply too small to have any real impact. The evidence established that existing uses on several of the prohibited streets are varied. Hotels and other multi-family structures were permitted uses on these streets. It is clear that the City Commission was aware that a substantial percentage of elderly residents currently reside in "retirement *hotels*," some located on the prohibited streets. Non-ACLF

elderly and infirm are not restricted from the listed commercial corridors in any manner. Thus the ordinance prohibiting 5 percent of the population, at most, from living on the named streets is fatally flawed, and in the language of *Cleburne*, underinclusive.

Reiterating *Cleburne*, when the effect of an ordinance is greatly attenuated, it cannot be found to be rationally related to the stated goal. Here, restricting such a small percentage of the elderly and infirm from living on the prohibited streets creates too attenuated an effect to be rationally related to the goal of keeping that group out of view in order to promote tourism and commercial development. Thus, it cannot be said that restricting ACLFs from the listed streets is rationally related to the state's goals of promoting tourism and commercial development.

■ The relationship between the last objective asserted by the city, to protect ACLF's resident from the dangers associated with congested areas, and the named street restriction is not supported by the record. Miami Beach is essentially a moderate- to high-density area. Traffic counts indicate that the level of traffic on some prohibited and some nonprohibited streets are substantially similar. In workshops and hearings held prior to the ordinance's passage, the traffic levels on the prohibited streets as compared to other streets were never discussed. Nor was it ever shown how prohibiting ACLFs from these streets would protect the targeted group, potential ACLF residents, from traffic-related dangers. The ordinance in no way restricts elderly and infirm persons who are not ACLF residents from living on these streets. If the goal is to increase the safety of the elderly and infirm, the ordinance's scope is vastly underinclusive, because it restricts only a small percentage of elderly and infirm from living on these streets. Such an underinclusive statute cannot reasonably be expected to further the city's stated goals.

Any individual, no matter how infirm or elderly, could purchase a condominium on

the 20th floor of a high-rise Collins Avenue apartment building or check into the top floor of any hotel located on Collins Avenue on Miami Beach without violating any of the fire safety codes of the city. The same individual, asuming he or she lacked the financial means to purchase the condominium or pay for the night's stay at the hotel, is prevented from living in an ACLF exceeding four stories in height. There is no rational basis for the city's position that a person who buys an expensive condominium on the top floor of a Collins Avenue high rise is safe while an individual of the same physical infirmity who occupies a room on the top floor of a high-rise ACLF is not. The only apparent distinction between the two individuals is that one is wealthy and one is poor.

■ The named streets restriction is not only unrelated to the goals advanced, but it is also the result of a discriminatory purpose. A court may properly review the general history of problems a law seeks to rectify and the history of the law's passage in evaluating its constitutionality. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). When the court is convinced that the background of a decision or its particular history shows a discriminatory purpose, the Court will strike the unconstitutional provisions. *Arlington Heights*, 429 U.S. at 267, 97 S.Ct. at 564.

### DISCRIMINATORY INTENT

The following factors demonstrate that the Miami Beach City Commission acted with discriminatory purpose in enacting the named streets restriction:

(1) On first reading of the proposed ACLF ordinance, the Commission voted to approve the ordinance containing just one mandatory restriction—the four story height restriction. This proposed ordinance substantially tracked the recommendation of Dr. Eric Pfeiffer, a consultant retained by the city. At the next meeting, on June 15, 1983, the Commission made a radical departure from their previous decision and adopted the ordinance as it now

stands, including the named streets restriction. There was no apparent reason for this turnaround. Specifically, there was no discussion indicating a need to make the named streets restriction mandatory. The additional mandatory provisions greatly restricted the number of ACLFs that could exist on Miami Beach. The administrative staff informed the Commission at the June 15 meeting that the ordinance would restrict the number of new facilities to below the level of need in Miami Beach. Thus, the Commission was well aware that its own staff found the ordinance overly restrictive in light of the existing need for ACLFs.

■ Staff recommendations and assessments are generally accorded careful consideration in making zoning decisions. In passing this ordinance, it appears the recommendations of the staff were ignored or revised without evidence to support the change of opinion. Substantive departures are found where factors usually considered relevant, here staff recommendations, suggest a different result from the one actually reached by the decision-makers. Discriminatory intent is established when substantive departures from established zoning policy exist in the decision-making process. *Arlington Heights*, 429 U.S. at 267, 97 S.Ct. at 564-5.

■ (2) The Commissioners failed to consider the existing uses and conditions on Miami Beach in deciding to prohibit ACLFs from the named streets. As stated above, no traffic studies were made to determine traffic flow on prohibited streets compared to other nonrestricted streets. The Commission failed to address the fact that a number of residential uses, including retirement hotels, existed on these commercial corridors. The Commission failed to address their own staff's opinion that the restrictions would make it impossible for Miami Beach to meet its need for ACLF residents, by countering evidence. This lack of objective criteria and departure from sound zoning practice support a conclusion that discriminatory purpose motivated the decision to restrict ACLFs from certain commercial streets. Where dis-

criminatory purpose is the motivating factor in the enactment of the ordinance, it is violative of equal protection for failure to carry out any legitimate governmental goal. *Arlington Heights*, 429 U.S. at 267, 97 S.Ct. at 564–5.

■ Sound zoning policy requires consideration of the existing uses and development of a targeted zoning area. *Penn Central Transportation Company v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). Failure to consider the existing uses and conditions in zoning decision-making is a substantial departure from normal procedure indicating that discriminatory purposes are motivating the particular decision. *Arlington Heights*, 429 U.S. at 267, 97 S.Ct. at 564.

(3) The ordinance permits ACLFs to be located on some commercially-oriented streets. At the June 15th city commission meeting the various commissioners appeared to take the contradictory position that Street A was a commercial corridor and therefore *not* suitable for ACLFs; while at the same time saying Street B is a commercial corridor and is suitable for ACLFs. There did not appear to be any rational distinction between Streets A and B.

■ (4) Finally, the minutes of the hearings leading up to the ordinance's passage contain statements by several commissioners advocating the restriction of ACLFs from the city because of fear or prejudice that the elderly deter tourism and tourism-related commerce. Where fear and prejudice are a motivating factor in passage of an ordinance, a violation of the equal protection clause results. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 448, 105 S.Ct. 3249, 3259, 87 L.Ed.2d 313 (1985).

## CONCLUSION

In summary, the court finds that Miami Beach Zoning Ordinance § 28–2–A–1, which limits ACLF buildings to four stories in height, and § 28–2–A–3, which prohibits ACLFs on certain streets violate the equal protection clause of the Fourteenth Amend-

ment to the United States Constitution because those provisions are not rationally related to the city's stated goals.

■ Because the plaintiffs have not shown that the bayfront or oceanfront restrictions of Section 28–2–A–2 of the Miami Beach Zoning Ordinance or the 1,500–foot separation standard suggested in Section 28–3–B–8 have any effect whatsoever on the plaintiffs' desire to use the Blackstone Hotel and the Charles Hotel as ACLFs, the court will not address the constitutionality of those provisions. Where a party has not shown that it has suffered injury as a result of a particular legislative provision, the court should not negate the legislative action. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

■ Likewise, the court declines to address the constitutionality of the 2,000 ACLF bed cap, because at present, the number of ACLF beds in Miami Beach is substantially less than 2,000. Hence, the challenge to the 2,000 cap is not yet ripe. *Johnson v. Sikes*, 730 F.2d 644 (11th Cir. 1984).

Because this case can be resolved in its entirety on the equal protection question, the court declines to address the plaintiffs' due process challenge.

The court's conclusion that Sections 28–2–A–1 and 28–2–A–3 of the Miami Beach Zoning Ordinance are unconstitutional has no effect on the other provisions of the ordinance. Section 28 contains a generality clause which states: "If any section, subsection, sentence, clause, phrase, or portion of this Ordinance is, for any reason, held invalid or unconstitutional by any court of any competent jurisdiction, such portion shall be deemed a separate, distinct and independent provision and such holding shall not affect the validity of the remaining portions of this Ordinance." Invalidation of a portion of the ordinance does not render the whole ordinance invalid where, as here, the city commission expressly stated their intent that the other sections and subsections remain valid. *Zobel v.*

*Williams,* 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982).

This order does not preclude the City of Miami Beach from enforcing any other city ordinance or safety code regulating living accommodations within the city.