**DISABLED AMERICAN VETERANS, et al., Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF VETERANS AFFAIRS, Defendant.**

**No. 91 Civ. 1413 (SWK).**

United States District Court, S.D. New York.

Jan. 31, 1992.

Bingham, Dana & Gould by Joseph C. Zengerle and Stephanie B. Lindquist, Washington, D.C., Bingham, Dana & Gould by Joanne D'Alcomo, Boston, Mass., and Dorsey & Whitney by David C. Singer, New York City, for plaintiffs.

Otto G. Obermaier, U.S. Atty., S.D.N.Y. by Diogenes P. Kekatos, Asst. U.S. Atty., New York City, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KRAM, District Judge.

This is a class action[1] challenging the constitutionality of Section 8001 of the Omnibus Budget Reconciliation Act of 1990, 38 U.S.C. § 3205,[2] in which plaintiffs seek injunctive relief as well as a declatory judgment pursuant to 28 U.S.C. § 2201. Plaintiffs now move, pursuant to Rule 65 of the Federal Rules of Civil Procedure, for an order preliminarily enjoining application of Section 3205. Plaintiffs contend that the Section is facially unconstitutional in that it denies them equal protection of the laws and due process of law in violation of the Fifth Amendment of the U.S. Constitution. The complaint also alleges that Section 3205 effects an improper taking without just compensation under the Fifth Amendment. Enforcement of the Section, according to plaintiffs, works sufficient irreparable harm to warrant the requested preliminary injunctive relief.

The defendant United States Department of Veterans Affairs (the "VA") cross-moves, pursuant to Rules 12(b)(1) and (6), for an order dismissing the complaint for lack of subject matter jurisdiction and failure to state a claim upon which relief may be granted. In the alternative, the VA moves, pursuant to Rule 12(c), for judgment on the pleadings. On November 8, 1991, the Court heard oral argument on the

---

1. By order dated July 17, 1991, this action was certified as a class action pursuant to Rule 23(a) and (b)(1) of the Federal Rules of Civil Procedure and upon the consent of the parties.

2. This section was recently re-codified as 38 U.S.C. § 5505 by Pub.L. No. 102–40, Title IV, § 402(b)(1), 105 Stat. 187, 238 (May 7, 1991), which redesignated numerous sections of Title 38 to reflect the chapter in which they are contained. For purposes of clarity, all references to sections of Title 38 are referred to by their old section numbers.

motions and now enters the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### 1. *Background*

The disability compensation scheme embodied in Title 38 of the United States Code is a variant of traditional workers' compensation law. Under the VA's compensation program, veterans are entitled to receive monthly compensation from the VA if they possess a service connected disability.[3] The purpose of such disability compensation is to "compensate for impaired earning capacity." *See* 38 U.S.C. § 355; *Rose v. Rose*, 481 U.S. 619, 630, 107 S.Ct. 2029, 2036, 95 L.Ed.2d 599 (1987). The amount of compensation to which a veteran is entitled depends on the degree to which the veteran's earning capacity has been impaired by a service-connected disability.

Section 3205 was proposed by the VA in early 1990 in a form substantially similar to that enacted. As enacted, the section provides, in pertinent part, as follows:

(a) In any case in which a veteran having neither spouse, child, nor dependent parent is rated by the Secretary in accordance with regulations as being incompetent and the value of the veteran's estate (excluding the value of the veteran's home) exceeds $25,000, further payment of compensation to which the veteran would otherwise be entitled may not be made until the value of such estate is reduced to less than $10,000.

(b)(1) Subject to paragraph (2) of this subsection, if a veteran denied payment of compensation pursuant to subsection (a) is subsequently rated as being competent, the Secretary shall pay to the veteran a lump sum equal to the total of the compensation which was denied the veteran pursuant to such paragraph. The Secretary shall make the lump-sum payment as soon as practicable after the end of the 90-day period on the date of the competency rating.

(2) A lump sum payment may not be made under paragraph (1) to a veteran who, within such 90-day period, dies or is again rated by the Secretary as being incompetent.

\* \* \* \* \* \*

38 U.S.C. § 3205.

Section 3205 thus terminates compensation for a discrete group of veterans: those deemed mentally incompetent by the VA who (1) have no spouse, minor child[4] or dependent parent, (2) are not institutionalized at public expense and (3) have estates (excluding the value of each veteran's home, if any) in excess of $25,000; and compensation is terminated until such a veteran's estate is reduced to $10,000.

Section 3205 overlays an existing statute, Section 3203(b)(1)(A), which terminates compensation to certain disabled veterans found mentally incompetent by the VA and who live in publicly funded institutions at public expense.[5] Section 3205 thus affects non-institutionalized incompetent disabled veterans as well as incompetent disabled veterans residing in private institutions.

Section 3205 affects only those veterans rated incompetent by the VA under its regulations. *See* 38 U.S.C. § 3205(a); 38 C.F.R. § 3.353(b). VA regulations define an incompetent as a person who "because of injury or disease lacks the mental capaci-

---

3. A "service-connected" disability is one that was incurred or aggravated during active duty in the ground, naval or air service. *See* 38 U.S.C. § 101(16).

4. For purposes of Title 38 and Section 3205, the term "child" refers to minor children or children dependent on the veteran. *See* 38 U.S.C. § 101(4).

5. Section 3203 provides in pertinent part as follows:

In any case in which a veteran having neither spouse nor child is beign furnished hospital treatment or institutional or domiciliary care without charge or otherwise by the United States, or any political subdivision thereof, is rated by the Veterans' Administration in accordance with regulations as being incompetent, and the veteran's estate (excluding the value of the veteran's home unless there is no reasonable likelihood that the veteran will again reside in such home) from any source equals or exceeds $1,500, further payments of ... compensation ... shall not be made until the estate is reduced to $500.

38 U.S.C. § 3203(b)(1)(A).

ty to contract or to manage his or her own affairs, including disbursement of funds without limitation." 38 C.F.R. §§ 3.354, 3.355. Under VA regulations, mental incompetence is not the equivalent of insanity. or lack of testamentary capacity. *See id.* Veterans whose service-connected injuries or diseases result in a mental disability may be rated incompetent but a veteran's incompetence, for purposes of VA regulations, need not arise from a service-connected disability. Of the approximately 2.2 million disabled veterans receiving compensation, approximately 20,500 are mentally incompetent and only 13,500 of these—or about one-half of one percent of the total 2.2 million disability compensation recipients—are affected by Section 3205.

Section 3205 went into effect on November 1, 1990. In January 1991, the VA notified veterans whose compensation would be subject to suspension that termination of benefits was scheduled to begin in April 1991.

### 2. *Fiduciaries*

The vast majority of the mentally incompetent veterans receiving compensation have fiduciaries who manage their money and provide other services. In some cases, the fiduciary is a close relative such as a parent, sibling or adult child. In others, private attorneys, financial institutions or government agencies serve as fiduciaries. Typically, fiduciaries receive a fee based on a small percentage of the income to, or value of, a veteran's estate.

If there is little or no income to a veteran's estate or if the estate becomes too small, it generally is no longer economically viable for fiduciaries, especially financial institutions and private attorneys, to provide fiduciary services. It is also likely that certain state agencies will be forced to discontinue fiduciary services as a consequence of fees lost as a result of Section 3205's termination of compensation. During 1990, the VA was forced to find alternate fiduciaries for several hundred incompetent veterans when one institutional fiduciary expressed its intention not to take on more cases or to withdraw from its duties when the estates were not of a sufficient size to make them economically viable to manage. *See* Affidavit of Joanne D'Alcomo dated August 9, 1991 ("D'Alcomo Aff."), Tab 14K at 346. The VA itself has acknowledged serious difficulties finding and retaining private fiduciaries in the past, and has admitted that Section 3205 will probably make the condition even worse. *Id.*

Fiduciaries are responsible for paying incompetent veterans' bills for housing, meals and clothing and, in certain cases, must issue funds on a weekly or daily basis. Fiduciaries also handle an array of exigencies such as payment for repairs of cars and homes, arrangements for travel to visit sick relatives or to attend funerals and provision of cash when spending money has been lost or stolen. Some incompetent veterans have drug or alcohol problems which require varying kinds of immediate attention, and fiduciaries on occasion have been required to post bail bonds in order to secure an incompetent veteran's release from jail.

### 3. *Legislative History*

Section 3205's legislative history is limited. The VA proposed the legislation in early 1990 in a form substantially similar to that enacted. D'Alcomo Aff., Tabs 14G–H. A hearing was held in May 1990, but the bill remained dormant until the fall of 1990, when Congress rushed to produce a sweeping proposal to reduce the federal deficit. *Id.*, Tab 14I, Tab 14M at 15629. Working under "a very short deadline," a House–Senate Conference Committee assembled a 1200–page report that proposed the Omnibus Budget Reconciliation Act of 1990. *Id.*, Tab 14M at 15629, Tab 14N at 17494. There was virtually no debate in either the House or Senate on Section 3205.

The limited legislative history, however, indicates that Section 3205 has one of four permissible objectives: (1) to reduce the federal budget deficit;[6] (2) to prevent non-dependent heirs of disabled veterans from

---

**6.** *See* D'Alcomo Aff., Tab 14M at 15719, Tab 14N.

inheriting the estates of such veterans;[7] (3) to prevent remote heirs of disabled veterans from inheriting estates from such veterans;[8] and (4) to prevent nondependent or remote heirs of disabled veterans from inheriting estates consisting of VA compensation.[9]

### a. Deficit Reduction

The budgetary impact on Section 3205's target group, if arguably significant in real dollars, is quite small when compared to the total VA compensation budget. In fiscal 1990, the Government spent 10.7 billion on veterans' compensation. Congress projected that in fiscal 1991, Section 3205 would save $125 million. Thus, by abolishing payments under Section 3205, Congress expected to save about one percent of the total compensation paid to veterans in 1990. The remaining compensation to 99% of the compensation recipients remains unaffected.

### b. Impeding Inheritances of Disabled Veterans' Estates by Non–Dependent Heirs

By eliminating compensation only to incompetent disabled veterans with no spouse, minor child or dependent parent, Section 3205 ignores most of the universe of disabled veterans who also have no such immediate dependents but whose non-dependent heirs will continue to inherit without diminution. As compared with the 20,500 mentally incompetent disabled veterans with no immediate dependents and the 13,500 of these affected by Section 3205, the total number of disabled veterans with no immediate dependents is at least 263,000 and as much as 611,700. Those veterans targeted by Section 3205—13,500—amount to only 2 to 5 percent of the total number of disabled veterans without immediate dependents. In other words, although there are 13,500 mentally incompetent disabled veterans without immediate dependents, there are at least 263,000 and as many as 611,700 similarly situated competent disabled veterans. Section 3205 leaves the estates of these competent veterans unimpaired although they greatly outnumber their incompetent counterparts and are without immediate dependents.

On the present record, the only characteristic distinguishing the disabled veterans without immediate dependents whose compensation is terminated by Section 3205, is their VA-rated mental incompetence.

### c. Impeding Inheritances of Disabled Veterans' Estates by Remote Heirs

On the present record, the status of incompetence makes it no more likely that an incompetent veteran's estate will be inherited by a remote heir than will the estate of a competent veteran. A VA rating of incompetence does not mean that a disabled veteran is incapable of executing a will. Incompetent veterans can and do have wills, as do members of the plaintiff class. *See, e.g.,* Affidavit of Lyall Fraser dated July 19, 1991 ("Fraser Aff."), Tab 10, ¶ 12; Affidavit of Michael D'Arco dated July 19, 1991 ("D'Arco Aff."), Tab 8, ¶ 29; Affidavit of Ada L. Savory dated July 19, 1991 ("Savory Aff."), Tab 3, ¶ 29; Affidavit of Sidney Gimple dated July 19, 1991, ("Gimple Aff."), Tab 6, ¶ 10; Affidavit of Robert Greene dated July 31, 1991 ("Greene Aff."), Tab 7, ¶ 23. Even if an incompetent disabled veteran presently lacks testamentary capacity, the veteran may have possessed

---

7. Before enactment, the VA referred to the proposal both as the "Veterans' Nondependent Heirs Inheritance Limitation Act of 1990," and as a bill to limit the amount of funds "subject to inheritance by nondependent heirs." D'Alcomo Aff., Tab 14J at 153, Tab 14G at 4929.

8. Evidence that the proposal's objective was to limit inheritances by disabled veterans' remote heirs is contained in the VA's budget proposal submitted in January, 1990, in testimony by the VA at a Senate hearing, and in a Senate Committee report. *See* D'Alcomo Aff., Tab 14D (VA budget submission); Tab 14I at 14 (VA testimony); Tab 14E at 380 (Senate Committee report).

9. *See, e.g.,* D'Alcomo Aff., Tab 14E at 380 (Senate Committee report noting that "purpose of the legislation is to prevent 'remote' heirs from inheriting large estates enhanced by VA benefits"); *id.* Tab 14G at 4929 (Administration transmittal letter printed in Congressional Record stating goal is to "limit the amount of accumulated veterans' disability compensation payments which could be inherited by nondependent heirs of incompetent veterans").

testamentary capacity in the past, and may have executed a valid will. That a disabled veteran may presently be mentally incompetent has no bearing on whether the veteran executed a valid will in the past, is capable of executing one in the present, or may possess the testamentary capacity to do so in the future.

There is no evidence of a correlation between mental incompetence at a particular stage of a disabled veteran's lifetime (or mental incompetence in general) and whether that person will die testate.[10] Similarly, there is no evidence that a VA rating of mental incompetence has a correlation to whether a disabled veteran's estate will pass to "remote" heirs or to whether, at the time of death, a veteran will have close family members available to inherit.

Whether an incompetent disabled veteran is survived by close family members will depend on the same factors that affect whether a competent disabled veteran will be survived by close family members, and are likely to include the health of the veteran's parents, the existence of any children or siblings of the veteran, and the age of the veteran at death. None of these factors (or any others) have been correlated to mental incompetence.

The vast majority of the beneficiaries of testate or intestate veterans declared mentally incompetent by the VA and without immediate dependents, are not persons "remote" to the incompetent veteran but persons such as siblings and adult parents. The VA's own data demonstrate that, in fact, incompetent veterans' estates overwhelmingly tend not to be inherited by remote heirs.[11] At least 84.7 percent of the estates of mentally incompetent disabled veterans surveyed by the VA were inherited by close family relatives: spouses, parents, siblings and the veteran's children. *See* D'Alcomo Aff., Tab 14L at 353–54, Tab 14K at 347–47.

State intestacy laws do not make it more likely that disabled veterans' estates will be inherited by remote heirs if the veterans are incompetent rather than competent. Intestate succession laws govern the transfer of estates when an individual dies without a valid will, regardless of whether the individual is competent or incompetent. In addition, that a veteran's estate is distributed according to the terms of a will rather than through intestate succession does not prevent inheritance by remote heirs. To the contrary, the ability of competent disabled veterans to make unrestricted bequests to individuals or entities with no familial relation to the veteran would appear to contribute to the distribution of disabled veterans' estates to "remote" heirs with no claim on the Government as a result of the veteran's military service.

Finally, the record establishes no basis for a determination that mentally incompetent disabled veterans in fact die intestate more frequently than do competent disabled veterans. Similarly, there is no basis for assuming that the estates of incompetent veterans will pass through the laws of intestacy of the several States to "remote" heirs any more frequently than do those of competent veterans. In fact, because competent veterans (who are unaffected by Section 3205), are more likely to have gainful employment than are incompetent veterans, their estates are likely to be larger, and a larger portion of such estates, including the portion comprised of disability benefits, is likely to devolve to "remote" heirs having no claim on the Government as a result of the veteran's disability.

#### d. Inheritance of VA–Derived Funds

There is evidence neither of the statistical, actuarial or other techniques, if any, used in gathering "empirical data" concerning what portion of a veteran's estate constitutes "VA-derived" funds, nor the basis for determining some ground of difference between the amounts of VA-derived funds

---

10. The VA has conceded a total lack of information as to the correlation between mental competence and testacy or intestacy. *See* D'Alcomo Aff., Tab 14K at 348.

11. The studies did not distinguish between those mentally incompetent disabled veterans who died testate and intestate. *See* D'Alcomo Aff., Tab 14K at 347–48.

available for inheritance by heirs of competent and incompetent disabled veterans.

### e. 90–Day Restoration Provision

Section 3205(b)(1) provides that, if an affected veteran is later rated competent for a continuous period of 90 days, the veteran recovers all the compensation of which the veteran was deprived during the period of incompetency. If, however, at any time within the 90–day period following a rating of competency the disabled veteran is again found incompetent by the VA, the veteran loses the opportunity to receive the lump-sum payment. Thus, to regain all the money lost by operation of Section 3205, a veteran must only acquire competence in the determination of the VA. The veteran need not acquire a spouse, minor child or dependent parent. Even if the veteran whose funds are restored is re-rated incompetent by the VA after the 90–day period, the veteran retains the lump-sum that was restored.

### 4. *Studies Relied Upon to Justify Section 3205's Classification*

The VA relies on two non-congressional reports studying incompetent veterans as justification for Section 3205's classification of mentally incompetent veterans. Neither the 1982 report by the General Accounting Office ("GAO"),[12] nor the 1988 report by the VA's Office of the Inspector General ("OIG"),[13] however, made any findings, drew any conclusions [14] or uncovered any facts which provide a basis for distinguishing the incompetent veterans, who were the subjects of the reports, from similarly situated competent veterans *who were not studied*. Both studies assumed, without empirical basis, that incompetent

disabled veterans' estates would pass through intestacy rather than under the terms of a will.

Neither the GAO nor OIG study surveyed the estates of competent disabled veterans with no immediate dependents, and neither study made any suggestion that the amounts which had accumulated in such estates—amounts potentially available for inheritance—were smaller. The studies neither drew conclusions, nor presented any facts, concerning the likelihood of competent disabled veterans' estates being inherited by nondependent or remote heirs.

In addition, the GAO studied estates of incompetent veterans in only four of the VA's 58 regions and concluded that its results could not be extrapolated nationwide. There is no evidence which suggests that estates of incompetent disabled veterans with no immediate dependents tend to accumulate more assets than the estates of similarly situated competent veterans. Ultimately, the studies failed to show that the objectives of Section 3205—preventing remote heirs or non-dependent heirs from inheriting disabled veterans estates—are likely to be achieved—if achieved at all—by terminating compensation to incompetent disabled veterans without addressing the termination of compensation to competent veterans.

### 5. *Preventing Misuse of Funds by Fiduciaries*

There is no evidence that a purpose of Section 3205 is to prevent misuse or misappropriation of disabled veterans' funds by fiduciaries. Notwithstanding anecdotal accounts of fiduciary misconduct in a statistically insignificant number of cases,[15] there

---

**12.** *See generally* Report To The Chairman Committee On Veterans' Affairs House of Representatives By The Comptroller General Of The United States, annexed as Exhibit "2" to VA's Memorandum of Law ("VA Mem.").

**13.** *See generally* Inspector General's Report on Payment to Incompetent Veterans, dated March 24, 1988, VA Mem. Ex. "1".

**14.** The GAO study did conclude, without analysis or further discussion, that "mentally incom-

petent veterans—as distinguished from competent veterans—are less likely to ultimately benefit fully from their estates accumulated from VA benefits. . . ." VA Mem. Ex. "2" at 3.

**15.** The VA Inspector General reported in 1988 that over a five-year period from 1983 to 1988, it had *investigated* 112 cases involving alleged improper use or theft of funds by fiduciaries out of a total number of 67,122 (as of 1986) incompetent veterans with fiduciaries. *See* VA Ex. 1 at 58, 51.

is no evidence that this was a legislative purpose ever proffered, debated or considered by Congress.

## CONCLUSIONS OF LAW

### A. VA's Jurisdictional Challenge

■ Before reaching the merits of plaintiffs' preliminary injunction application, the Court must address the threshold issue of subject matter jurisdiction. The VA argues that a recent amendment to Section 211(a) of Title 38 vests exclusive jurisdiction over this controversy in the newly-created U.S. Court of Veterans Appeals (the "COVA") (an Article I court), and deprives this Court of jurisdiction to hear a facial constitutional challenge to a federal statute administered by the VA. The VA contends that the plain language of Section 211(a), "read *in pari materia* with 38 U.S.C. §§ 4061 and 4092 [precludes plaintiffs] from maintaining this action in this Court." VA Mem. at 19–20. The VA's motion does not raise a serious jurisdictional challenge.

Federal courts should avoid an interpretation of a federal statute "that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question." *Gomez v. United States*, 490 U.S. 858, 864, 109 S.Ct. 2237, 2241, 104 L.Ed.2d 923 (1989); *see Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 841, 106 S.Ct. 3245, 3251, 92 L.Ed.2d 675 (1986); *Crowell v. Benson*, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932). Accordingly, the Court first turns to the language of the statute itself to determine whether the statute is susceptible of an interpretation which would obviate resolution of the serious constitutional question otherwise raised by the VA's contention that the district courts are without jurisdiction to hear facial constitutional challenges to federal statutes affecting veterans' benefits.

The starting point for interpreting a statute is the language of the statute itself and, "[a]bsent a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Section 211(a) provides in pertinent part as follows:

(1) The [Secretary of Veterans Affairs] shall decide all questions of law or fact necessary to a decision by the [Secretary] under a law that affects the provision of benefits by the [Secretary] to veterans or the dependents or survivors of veterans.... *[T]he decision of the [Secretary]* as to any such question shall be final and conclusive and may not be reviewed by any other official or any other court....

(2) The second sentence of paragraph (1) of this subsection does not apply to

\* \* \* \* \* \*

(D) matters covered by chapter 72 of this title.

38 U.S.C. § 211(a) (1991) (emphasis added).[16] Section 211(a) precludes judicial review of any "decision by the [Secretary] under a law that affects the provision of benefits by the [Secretary]," but provides an exception for review of such decisions by the COVA. *See* 38 U.S.C. § 211(a)(2)(D). The plain language of the statute indicates that the applicability of its preclusion of judicial review is limited to "decision[s] by the Secretary." Nothing in the statute indicates that it has any applicability to judicial review of *facial* challenges to federal legislation affecting veterans benefits as is the case in this action. As in *Johnson v. Robison*, 415 U.S. 361, 367, 94 S.Ct. 1160, 1165, 39 L.Ed.2d 389 (1974), the questions of law presented in this case concern "whether there [is] a valid law ... for the [Department of Veterans' Affairs] to execute," rather than whether a decision of the Secretary impinges upon a right of constitutional dimension. *See also Tray-*

---

**16.** Prior to amendment in 1988, Section 211(a) provided:

*[T]he decisions of the Administrator* on any question of law or fact under any law administered by the Veterans' Administration pro-

viding benefits for veterans ... *shall be final* and conclusive and no other official or court of the United States shall have the power or jurisdiction to review any such decision.... 38 U.S.C. § 211(a) (1979).

*nor v. Turnage*, 485 U.S. 535, 543, 108 S.Ct. 1372, 1379, 99 L.Ed.2d 618 (1988) (quoting *Robison*, 415 U.S. at 367, 94 S.Ct. at 1165) (prior Section 211(a) insulates from review decisions of law and fact "under any law administered by the Veterans' Administration," that is, decisions made in interpreting or applying "a particular provision of the statute to a particular set of facts"). Accordingly, the Court holds Section 211(a) inapplicable to plaintiffs' facial constitutional challenge to Section 3205 since the enactment of Section 3205 constitutes a decision not of the Secretary, but of Congress.[17] *See Robison*, 415 U.S. at 367, 94 S.Ct. at 1165.

Reading Section 211(a) in conjunction with Sections 4052, 4061 and 4092 of Title 38 does nothing to further the VA's position. In Section 4052,[18] Congress granted the COVA "exclusive jurisdiction" over decisions of the Board of Veterans' Appeals (the "BVA") whose jurisdiction, in turn, is limited to review of decisions of the Secretary. *See* 38 U.S.C. § 4004. Under Section 4052, therefore, the COVA's jurisdiction is limited to appeals from decisions of the Secretary as set forth in Section 211(a).

Section 4061's "scope of review provision" similarly does nothing to expand the COVA's limited jurisdiction to hear appeals of BVA decisions concerning "decisions of the [Secretary]." Section 4061 empowers the COVA to resolve constitutional questions "to the extent necessary" in reviewing a decision of the BVA, but cannot reasonably be construed, in light of the plain language of the statute and its position within chapter 72's adjudicatory scheme, to affirmatively grant jurisdiction to the COVA to hear and determine constitutional challenges other than those squarely raised by a decision of the Secretary.[19] In addition, Section 4092, which provides for review of certain COVA decisions by the U.S. Court of Appeals for the Federal Circuit ("CAFC") and allows for direct challenges to VA regulations in the CAFC, does nothing to expand the COVA's exclusive jurisdiction to include facial constitutional challenges to legislation affecting veterans.[20]

17. There is thus no provision of Title 38 which requires plaintiffs' to first bring their facial constitutional challenge before the Secretary for decision. Plaintiffs' challenge to Section 3205 is thus not subject to Title 38's adjudication scheme.

18. Section 4052 provides as follows:
(a) The Court of Veterans Appeals shall have exclusive jurisdiction to review decisions of the Board of Veterans' Appeals. The [Secretary] may not seek review of any such decision. The court shall have power to affirm, modify, or reverse a decision of the Board or to remand the matter, as appropriate.

\* \* \* \* \* \*

(c) Decisions of the [COVA] are subject to review as provided in Section 4092 of this Title.
38 U.S.C. § 4052.

19. Section 4061 provides in pertinent part:
In any action brought under this chapter, the Court of Veterans Appeals to the extent necessary to its decision and when presented, shall—
(1) decide all relevant questions of law, interpret constitutional, statutory, and regulatory provisions, and determine the meaning or applicability of the terms of an action of the Secretary; ...

\* \* \* \* \* \*

(3) hold unlawful and set aside decisions, findings ... conclusions, rules and regulations issued or adopted by the [Secretary], the

Board of Veterans' Appeals, or the Chairman of the Board found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, power, or immunity;
(C) in excess of statutory jurisdiction, authority, or limitations, or in violation of a statutory right; or
(D) without observance of procedure required by law; and
(4) in the case of a finding of material fact made in reaching a decision in a case before the Veterans' Administration with respect to benefits under laws administered by the Veterans' Administration, hold unlawful and set aside such finding if the finding is clearly erroneous.

\* \* \* \* \* \*

38 U.S.C. § 4061.

20. Section 4092 provides in pertinent part as follows:
(a) After a decision of the United States Court of Veterans Appeals is entered in a case, any party to the case may obtain a review of the decision with respect to the validity of any statute or regulation ... or any interpretation thereof ... that was relied upon by the Court in making a decision....

\* \* \* \* \* \*

(c) The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdic-

The Court has considered the legislative history relied upon by the VA in support of its jurisdictional argument and concludes that this too provides no support for the VA's position.

In urging its construction of Section 211(a), the VA entirely ignores the critical significance of plaintiffs' constitutional challenge in the context of Title 38's adjudication scheme. Although the Court is not called upon to address the issue of whether Section 211(a) permissibly deprives the district courts of jurisdiction to hear challenges to decisions of the Secretary which raise issues of constitutional dimension,[21] that issue is patently dissimilar to the one at hand. Accordingly, as the plain meaning of Section 211(a) does not divest this Court of jurisdiction over plaintiffs' constitutional claims the Court has jurisdiction pursuant to 28 U.S.C. § 1331 since this action arises under the Constitution of the United States. The Court proceeds to the merits of plaintiffs' application for a preliminary injunction.

### B. Equal Protection Basis for Preliminary Injunction

■ Plaintiffs are entitled to a preliminary injunction if they can establish that they are likely to suffer irreparable injury if the injunction is not granted and either (1) a likelihood of success on the merits of their case or (2) a sufficiently serious question going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in their favor.

tion to review and decide any challenge to the validity of any statute or regulation or any interpretation thereof brought under this section, and to interpret constitutional and statutory provisions, to the extent presented and necessary to a decision. The judgment of such court shall be final subject to review by the Supreme Court upon certiorari, in the manner provided in section 1254 of title 28. (d)(1) The Court of Appeals for the Federal Circuit shall decide all relevant questions of law, including interpreting constitutional and statutory provisions. The court shall hold unlawful and set any regulation or any interpretation thereof ... that was relied upon in the decision of the Court of Veterans Appeals that the Court of Appeals for the Federal Circuit finds to be—

See *Coca Cola Co. v. Tropicana Products, Inc.,* 690 F.2d 312, 314–15 (2d Cir.1982); *see also Reuters, Ltd. v. United Press Int'l, Inc.,* 903 F.2d 904 (2d Cir.1990). The Court addresses these elements in turn.

### 1. *Irreparable Harm*

#### a. Possible Constitutional Violation

Where possible deprivation of a constitutional right is implicated, most courts, including the Court of Appeals for this Circuit, hold that no further showing of irreparable injury is necessary. *See Mitchell v. Cuomo,* 748 F.2d 804, 806 (2d Cir.1984) (quoting 11 C. Wright & A. Miller, *Federal Practice & Procedure,* § 2948 at 440 (1973 & 1991 Supp.)). If plaintiffs are being deprived of their right to equal protection of the laws arising from the enforcement of Section 3205, it follows inexorably that they are being harmed irreparably. *See Ambrose v. Malcolm,* 414 F.Supp. 485, 493 (S.D.N.Y.1976). Accordingly, as plaintiffs have made a sufficiently strong showing of possible deprivation of their constitutional right to equal protection of the laws stemming from the VA's enforcement of Section 3205 and the resulting denial of compensation payments, *see* pp. 26–37, *infra,* the Court concludes that the enforcement of Section 3205 and its consequences constitute irreparable injury as a matter of law. *See Mitchell,* 748 F.2d at 806; *Doe v. New York City Dept. of Social Services,* 670 F.Supp. 1145, 1185 (S.D.N.Y.1987).

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or in violation of a statutory right; or

(D) without observance of procedure required by law.

  *  *  *  *  *  *

38 U.S.C. § 4092.

21. The issue is not one of first impression in this Circuit. *See, e.g., Pappanikoloaou v. Administrator of the Veterans' Admin.,* 762 F.2d 8 (2d Cir.) (per curiam), *cert. denied,* 474 U.S. 851, 106 S.Ct. 150, 88 L.Ed.2d 124 (1985); *Eastern Paralyzed Veterans Ass'n v. Veterans' Admin.,* 762 F.Supp. 539, 544 (S.D.N.Y.1991).

#### b. Other Injuries

Plaintiffs have also made a strong evidentiary showing of irreparable harm based upon actual and imminent loss of fiduciary services, short and long-term financial disruption and loss of the ability to live independently outside public institutions. The record contains substantial and uncontradicted proof that loss of VA compensation pursuant to Section 3205, even a temporary loss, imperils the ability of incompetent disabled veterans to retain fiduciaries who perform necessary services on a daily basis. Loss of fiduciaries is inevitable when incompetent veterans' estates are forced to dwindle to $10,000 or less. *See, e.g.,* Affidavit of Rudolpf C. Hauss dated July 19, 1991 ("Hauss Aff."), Tab 7, ¶¶ 26–32; Gimple Aff., Tab 6, ¶¶ 29–33; Greene Aff., Tab 7, ¶¶ 26–27; Affidavit of Glenn P. McCarty dated July 19, 1991 ("McCarty Aff."), Tab 9, ¶¶ 29–36. *See also* Fraser Aff., Tab 10, ¶¶ 1, 3, 7–9, 14 (State of Oregon which serves as fiduciary for approximately 375 veterans, including approximately one-half with service-connected disabilities, may no longer be able to provide any fiduciary services as a direct result of Section 3205). Significantly, the VA itself has anticipated that Section 3205 may cause hardship among the veterans affected. *See* D'Alcomo Aff. Tab 14K at 346; Tab 14C at 91.

The long and short-term financial disruption to the affected veterans also constitutes irreparable injury. In addition to the financial disruption engendered directly and indirectly by the loss of fiduciaries, plaintiffs have established that the cashflow disruptions to veterans with non-liquid assets will be severe, causing myriad injuries including, but not limited to, diminution, and in some cases complete frustration, of incompetent veterans' ability to live independently. *See, e.g.,* Gimple Aff., Tab 6, ¶¶ 15, 27; Affidavit of Robert Ahearn dated July 19, 1991 ("Ahearn Aff."), Tab 5,

¶ 3; Hauss Aff., Tab 12, ¶ 25; McCarty Aff., Tab 9, ¶¶ 25–28; Neal Aff., Tab 2, ¶¶ 43–44; Savory Aff., Tab 3; Affidavit of Charlotte Kerr dated August 1, 1991 ("Kerr Aff."), Tab 13, ¶¶ 1–8. The operation of Section 3205 to frustrate certain incompetent veterans' ability and efforts to live independently and to avoid becoming wards of public institutions clearly establishes irreparable harm.

#### 2. *Likelihood of Success on the Merits*

Plaintiffs have established a strong likelihood of success on the merits of their equal protection claim. The constitutional guarantee of equal protection is "essentially a direction that all persons similarly situated should be treated alike." *Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985).[22] The equal protection guarantee denies the government the "power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute." *Eisenstadt v. Baird,* 405 U.S. 438, 447, 92 S.Ct. 1029, 1035, 31 L.Ed.2d 349 (1972) (quoting *Reed v. Reed,* 404 U.S. 71, 75–76, 92 S.Ct. 251, 253–254, 30 L.Ed.2d 225 (1971)). A statutory classification therefore "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *Id.* 405 U.S. at 447, 92 S.Ct. at 1035 (quoting *Royster Guano Co. v. Virginia,* 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989 (1920)); *see also Walters v. St. Louis,* 347 U.S. 231, 237, 74 S.Ct. 505, 509, 98 L.Ed. 660 (1954) (classification must have some relevance to the purpose for which classification is made and not result in differing treatments so disparate, relative to the classification, as to be wholly arbitrary). Equal protection thus " 're-

---

**22.** The Fifth Amendment of the Constitution includes the concept of equal protection of the laws. *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954). The approach in analyzing equal protection claims under the Fifth Amendment is identical to that used in such claims under the Fourteenth Amendment of the Constitution, which is applicable to the States. *Weinberger v. Wiesenfeld,* 420 U.S. 636, 638, 95 S.Ct. 1225, 1228, 43 L.Ed.2d 514 (1975).

quire[s] that a distinction made have some relevance to the purpose for which the classification is made.'" *Doe by Doe v. Austin*, 848 F.2d 1386, 1394 (6th Cir.) (quoting *Baxstrom v. Herold*, 383 U.S. 107, 111, 86 S.Ct. 760, 762, 15 L.Ed.2d 620 (1966)), *cert. denied*, 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 531 (1988). Only when a challenged classification "rationally furthers some legitimate, articulated ... [governmental] purpose" will it survive constitutional scrutiny under the rational basis test.[23] *San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973); *see Ben–Shalom v. Marsh*, 881 F.2d 454, 463 (7th Cir. 1989), *cert. denied*, 494 U.S. 1004, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990); *see also Cleburne*, 473 U.S. at 446, 105 S.Ct. at 3257 (government "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational").

When a statutory classification serves no legitimate government purpose other than to discriminate, it denies equal protection of the laws. *See Ranschburg v. Toan*, 709 F.2d 1207, 1211 (8th Cir.1983) (rejecting argument that challenged classification is rationally based because statute accomplishes stated goal of treating one class differently from another since such a classification is, in effect merely a restatement of the classification); *Cleburne*, 473 U.S. at 450, 105 S.Ct. at 3259; *Silbowitz v. Secretary of Health, Education & Welfare*, 397 F.Supp. 862 (S.D.Fla.1975), *aff'd*, 430 U.S. 924, 97 S.Ct. 1539, 51 L.Ed.2d 768 (1977); *Burstyn v. Miami Beach*, 663 F.Supp. 528, 536–37 (S.D.Fla.1987). Notwithstanding the deference generally accorded legislative enactments, the Government may not rely on budgetary considerations to justify classifications not otherwise rationally related to a legitimate government purpose. *See Plyler v. Doe*, 457 U.S. 202, 227, 102

S.Ct. 2382, 2400, 72 L.Ed.2d 786 (1982) ("concern for the preservation of resources standing alone can hardly justify the classification used in allocating ... resources"); *Shapiro v. Thompson*, 394 U.S. 618, 633, 89 S.Ct. 1322, 1330, 22 L.Ed.2d 600 (1969) (the saving of welfare costs cannot justify an otherwise invidious classification); *Williams v. Manson*, 499 F.Supp. 773, 777 (D.Conn.1980) (budgetary considerations alone cannot justify discriminatory treatment not otherwise rationally related to legitimate government purpose).

In order to survive rational basis scrutiny, the VA must establish that Section 3205 rationally furthers an articulated government purpose; there must be "some ground of difference" for the statute's distinction between similarly situated incompetent and competent veterans that bears a substantial relation to such purpose. *See San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. at 17, 93 S.Ct. at 1288; *Eisenstadt v. Baird*, 405 U.S. at 447, 92 S.Ct. at 1035; *Crawford v. Cushman*, 531 F.2d 1114, 1122 (2d Cir.1976). Of the four legitimate legislative purposes supported by the record, e.g., to reduce the federal budget deficit, to prevent non-dependent heirs of incompetent disabled veterans from inheriting the estates of such veterans, to prevent remote heirs of incompetent disabled veterans from inheriting estates from such veterans, and to prevent nondependent or remote heirs of incompetent disabled veterans from inheriting estates consisting of VA compensation, *see* pp. 7–8, *supra*, not a single one bears a rational relation to the classification drawn by Section 3205.

### a. Deficit reduction

Section 3205 was passed as part of the Omnibus Budget Reconciliation Act of 1990, in a form substantially similar to that

---

**23.** For purposes of this motion, the Court assumes, without deciding, that rational basis scrutiny applies to plaintiffs equal protection claim. Plaintiffs' similarly assume, for the purposes of this motion only, that the rational basis test applies. Pl. Mem. at 28 n. 14. They do not concede, however, that a more demanding level of scrutiny is inapplicable. Relying on *Plyler v.*

*Doe*, 457 U.S. 202, 221, 102 S.Ct. 2382, 2396, 72 L.Ed.2d 786 (1982), plaintiffs intend to argue, on summary judgment, that compensation to veterans with service-connected disabilities is an earned benefit, and though not a right granted by the Constitution, "neither is ... merely some governmental 'benefit' indistinguishable from other forms of social welfare legislation."

proposed by the VA. The statute was enacted virtually without debate in the House or Senate. The statute's ultimate goal is reduction of the federal budget deficit, an obviously legitimate government objective. Congressional concern over deficit reduction alone, however, will not justify an otherwise impermissible legislative classification. *See Plyler,* 457 U.S. at 227–29, 102 S.Ct. at 2400–01; *Shapiro,* 394 U.S. at 633, 89 S.Ct. at 1330.

In Section 3205, Congress chose to terminate compensation to a small percentage of compensation recipients. The targeted group of disabled veterans rated mentally incompetent is trivial as compared with the total number of disabled veterans receiving compensation. The record indicates that of the approximately 2.2 million disabled veterans receiving compensation, approximately 20,500 are mentally incompetent and only 13,500 of these—or about one-half of one percent of the total 2.2 million disability compensation recipients—are targeted by Section 3205.

Similarly, the budgetary impact of Section 3205's target group is miniscule when compared to the total compensation budget. In fiscal 1990, the federal government spent $10.7 billion on compensation to disabled veterans. Congress projected that in fiscal 1991, Section 3205 would realize a savings of approximately $125 million, or about one percent of the total compensation paid to disabled veterans in 1990. The remaining compensation recipients whose payments consumed nearly 99 percent of the compensation budget, remain unaffected by the legislation.

Where, as here, a classification includes only a tiny percentage of those whose potential inclusion would also further the identical legitimate governmental objective, and when that tiny percentage has only a small impact on achieving the Government's goal, such underinclusiveness is a strong indication that the classification violates equal protection. *Burstyn,* 663 F.Supp. at 535 (when the effect of an ordinance is greatly attenuated, it cannot be found to be rationally related to the stated goal).

The VA's argument that the exercise of Congressional power over a limited public fisc will inevitably leave some comparatively needy person "outside the favored circle" of legislation, *see Schweiker v. Wilson,* 450 U.S. 221, 238, 101 S.Ct. 1074, 1084, 67 L.Ed.2d 186 (1981), does not persuade the Court that the classification drawn by Section 3205 is merely a "surgical" budgetary reduction resulting in less disruption to disabled veterans than it otherwise might. *See* VA Mem. at 47, 51 n. 42. Although remedial legislation is not invalid simply because it might have gone farther than it did, *see, e.g., San Antonio Indep. School Dist. v. Rodriguez,* 411 U.S. at 38–39, 93 S.Ct. at 1299–1300, a legislative classification must nevertheless be sufficiently related to the attainment of permissible governmental objectives so as not to render the classification arbitrary or irrational. *See Eisenstadt v. Baird,* 405 U.S. at 447, 92 S.Ct. at 1035. That fiscal constraints mandate exclusion of certain individuals from remedial legislation does not exempt the Government from drawing classifications which comport with well-established equal protection principles, foremost among them that the classification drawn bear a rational relation to the attainment of the legislative objective.

b. Impeding inheritances of disabled veterans estates by non-dependent heirs

Considered as a vehicle to prevent inheritances of disabled veterans estates by non-dependent heirs, Section 3205 is not only underinclusive but also irrational, and thereby constitutionally impermissible. Neither logic nor the record supports the assertion that Section 3205 succeeds in reducing the likelihood of inheritance of VA-derived funds by non-dependent heirs.

By eliminating compensation only to incompetent disabled veterans with no spouse, minor child or dependent parent, Section 3205 ignores most of the universe of disabled veterans who also have no immediate dependents and whose non-dependent heirs will thus continue to inherit without diminution by Section 3205. As the

statute is patently underinclusive, it cannot reasonably be expected to further the Government's objective of reducing the incidence of inheritance of VA-derived funds by non-dependent heirs. *See Burstyn,* 663 F.Supp. at 535.

Even if Section 3205 achieves, in a small way, the Government's objective of limiting the size of [incompetent] disabled veterans' estates that may be inherited by non-dependent heirs, Congress must still support its selection of the targeted group as the appropriate target. The record, however, contains no evidence that incompetence is relevant to achieving Congress' objective.

In this case, a key factor in the statutory classification is a lack of immediate dependents having some claim against the Government on account of the veteran's military service. There is not the slightest evidence to suggest anything other than an equivalent probability that both competent and incompetent veterans are likely to have no such dependents. Denying compensation only to dependent-less incompetents is thus no more likely to further Congress' objective, and thus is no more rational, than a statutory classification affecting only, for example, dependent-less veterans with red hair or Gaelic surnames.

Where, as here, the Government makes no showing of a rational basis for excluding one group from a statute's purview when the factor key to attainment of the Government's articulated objectives is present in another similarly situated group but remains unaddressed by the statute, equal protection has been denied.

### c.  Impeding inheritance of disabled veterans estates by "remote" heirs

When viewed as a means to impede inheritance by remote heirs rather than just non-immediate dependents, Section 3205 violates equal protection because, in practical effect, it does not rationally further Congress' objective. *See U.S. Dep't of Agriculture v. Moreno,* 413 U.S. 528, 537, 93 S.Ct. 2821, 2827, 37 L.Ed.2d 782 (1973). Section 3205 improperly assumes that the estates of mentally incompetent disabled veterans are more likely to be inherited by

remote heirs than are the estates of competent veterans.

With respect to effectively impeding inheritance of disabled veterans' estates by "remote" heirs, Section 3205 relies on the assumption that incompetent veterans are incapable of executing or having wills and that, as a result, their estates are likely to be distributed under the laws of intestacy. Section 3205 necessarily relies on the corollary assumption that the rate of incompetent veterans' intestacy is greater than that of competent veterans. Neither assumption is supported by the record.

Under the VA's own regulations, mental incompetence is not the equivalent of testamentary capacity. VA regulations as well as general principles of the law of wills make clear that a veteran may be rated mentally incompetent for compensation purposes and still have testamentary capacity. *See* 38 C.F.R. §§ 3.353(a), 3.355(c); *see generally* Uniform Probate Code § 2–501, 8 U.L.A. 102 (1991 Supp.); Mass.Gen.Laws ch. 191, § 1 (1990); N.Y. Estates Powers & Trusts Law § 3–1.1 (McKinney's 1981). Consequently, mentally incompetent individuals have been found to possess the capacity to execute wills during the time they were considered mentally incompetent. *See, e.g., Anderson v. Anderson,* 210 Ga. 464, 80 S.E.2d 807 (1954); *In re Estate of Weber,* 471 P.2d 919 (Okl.1970); *In re McCrone's Estate,* 106 Colo. 69, 101 P.2d 25 (1940).

Testamentary capacity is judged by the state of the testator's mind at the time of the execution of a will, the veteran may have executed a valid will in the past though lacking testamentary capacity in the present. *See, e.g., Shevlin v. Jackson,* 5 Ill.2d 43, 124 N.E.2d 895, 897 (1955); *In re Estate of Dunne,* 130 Cal.App.2d 216, 278 P.2d 733, 735 (2d Dist.1955); *In re Estate of Schoch,* 209 Neb. 812, 311 N.W.2d 903 (1981). Since the median age of compensation recipients is 61, an incompetent veteran of the median age who presently lacks testamentary capacity may have executed a valid will any number of years earlier. *See* D'Alcomo Aff., Tab 140 at S–92. The most conclusive evidence of

the VA's faulty assumption is that members of the plaintiff class, in fact, can and do have wills. *See* Fraser Aff., Tab 10, ¶ 12; D'Arco Aff., Tab 8, ¶ 29; Savory Aff., Tab 3, ¶ 29; Gimple Aff., Tab 6, ¶ 10; Greene Aff., Tab 7, ¶ 7.

Even if testacy prevented inheritances by remote heirs—which it plainly does not—there is no factual basis to conclude that mental incompetence at any particular stage of a veteran's lifetime is predictive of whether the person will die testate. The uncontradicted statistical evidence is that *58% of all Americans* do not have wills, and that the most important factors in determining testacy are age, wealth, and high occupational status. *See* Mulder, *Intestate Succession under the Uniform Probate Code,* 2 Prospectus 301, 307–12 (May 1990). The VA has presented no study or data that suggests that a VA rating of mental incompetence, or mental incompetence in general, has any correlation to intestacy. The VA, in fact, has conceded a total lack of information on the subject. *See* D'Alcomo Aff., Tab 14K at 348.

Section 3205 also relies on the assumption that incompetent veterans are less likely than competent veterans to have close relatives at the time of death. The record, however, contains nothing about a VA rating of mental incompetence that is predictive of whether a veteran will, at the time of death, have close family members. Whether an incompetent veteran is survived by close family members will likely depend on the same factors that effect whether a competent veteran will be survived by close family members; namely,

the health of the veteran's parents, the existence of children or siblings of the veteran, and the age of the veteran at death. The record contains no distinguishing feature of VA-rated incompetent disabled veterans that would make such veterans less likely than competent disabled veterans to be survived by close relatives such as nondependent parents, siblings or adult children.

Furthermore, the VA's own studies show that, in fact, incompetent veterans' estates overwhelmingly tend *not* to be inherited by remote heirs. *See* D'Alcomo Aff., Tab 14L at 353–54, Tab 14K at 347–48. VA statistics show that at least 84.7 percent of surveyed estates of mentally incompetent disabled veterans were inherited by close family relatives including spouses, parents, siblings, and the veterans' children.[24]

The structure of intestacy schemes under the laws of the several States also tends to undermine the assumption that remote heirs are more likely to inherit incompetent disabled veterans' estates. Intestate succession laws govern the transfer of estates when an individual dies without a valid will, regardless of whether the individual is competent or incompetent.[25] There is thus nothing about an intestate veteran's competency which may determine whether the veteran's estate will be inherited by a remote heir.[26]

### d. Fiduciary misconduct

The VA's argument that Congress enacted Section 3205 as a response to concern about fiduciary misconduct is unsupported

---

24. The study did not distinguish between mentally incompetent veterans who died testate and intestate, nor did it distinguish between dependent and non-dependent heirs. *See* D'Alcomo Aff., Tab 14K at 347–48.

25. Under virtually all intestacy schemes, close relatives are favored over remote relatives. *See, e.g.,* M. Sussman, J. Cates & D. Smith, *The Family and Inheritance* 16–17 (1970); Uniform Probate Code, §§ 2–101 to 2–114, 8 U.L.A. (1991 Supp.); Mass.Gen.Laws ch. 190, §§ 1–3 (1990); N.Y. Estates Powers & Trusts Law § 4–1.1 (McKinney 1981). The order of inheritance of a typical intestate succession law is as follows: spouse, if one survives; children of the decedent or their grandchildren; decedent's parents;

brothers and sisters; nieces and nephews; and grandparents. M. Sussman, *supra,* at 17. When a disabled veteran—competent or incompetent—dies intestate without immediate dependents or close relatives, the veteran's estate may be inherited by any number of other relatives with whom the veteran may have had close bonds.

26. In contrast, if an estate is distributed according to the terms of a will, it can be inherited by whichever persons or entities the testator chooses, inside or outside the testator's family. Similarly, a competent disabled veteran may make testamentary bequests to relatives considered "remote" if the testator had no closer relatives.

by the record. The VA may not, consistent with the trend of recent caselaw, invent objectives that Congress never stated an intention to achieve. The Court is required to assume that "the objectives articulated by [Congress] are the actual purpose of [Congress], unless an examination of the circumstances forces us to conclude that they 'could not have been a goal of [that policy].'" *Hancock Industries v. Schaeffer,* 811 F.2d 225, 239 (3d Cir.1987) (citations omitted). Cases such as *Hancock* thus instruct that the Court "be sure that the rationale advanced is not simply an afterthought supplied purely by hindsight." *Alma Soc. v. Mellon,* 601 F.2d 1225, 1235 (2d Cir.), *cert. denied,* 444 U.S. 995, 100 S.Ct. 531, 62 L.Ed.2d 426 (1979).

Since the record contains no reference to any committee report on Section 3205 referring to a purpose of preventing misuse of veterans' funds by fiduciaries, nor any other evidence of such a purpose, the Court will not consider prevention of fiduciary misconduct an articulated goal of Section 3205.

Even were the Court to consider prevention of fiduciary misconduct an unarticulated but theoretically possible rationale for the classifications drawn by Section 3205, such a rationale does not appear to be rationally related to the classifications drawn by Section 3205. There is at best anecdotal evidence of a statistically negligible number of *investigations* of fiduciary misconduct which, does not, in the Court's view, provide a rational basis for the classification drawn by Section 3205. The VA has failed to produce any evidence or refer

to anything in the legislative history to suggest that fiduciaries for incompetent veterans "have a greater propensity than others for misusing or misappropriating funds," *Bacon v. Toia,* 648 F.2d 801, 809 (2d Cir.1981), *aff'd,* 457 U.S. 132, 102 S.Ct. 2355, 72 L.Ed.2d 728 (1982), and there is no basis for the Court to presume such a propensity. *Id.; see Jiminez v. Weinberger,* 417 U.S. 628, 637, 94 S.Ct. 2496, 2502, 41 L.Ed.2d 363 (1974).

e. Discriminatory effect

Because the articulated objectives of Section 3205 bear no substantial relation to the classification drawn to attain those objectives, the Court concludes that Section 3205's virtually exclusive, if unintended, result is impermissible discrimination against mentally incompetent disabled veterans.[27] Section 3205's "90–day restoration" provision, which tends to indicate that mental incompetence is an important—if not the sole—target of the legislation, as well as Congress' interference with the testamentary freedom of incompetent, but not competent, veterans is substantial evidence of irrational discrimination against the mentally disabled.

A statute that diminishes the testamentary freedom of mentally incompetent veterans with no dependents, while preserving the testamentary freedom of similarly situated competent veterans, produces incongruous and inconsistent results, primarily because the bases for drawing such a distinction, embodied in Section 3205, are unsupportable and irrational assumptions about mentally incompetent veterans.[28] As

**27.** The discriminatory treatment embodied in Section 3205 appears to be a carryover from the 1920's when Congress first drew classifications based upon veterans' competence in the precursor to the current Title 38. *See* World War Veterans' Act, 1924, ch. 320, § 202(7), 43 Stat. 619; D'Alcomo Aff., Tab 14C at 85. Vestiges of the disparate treatment of mentally disabled veterans remain in Section 3203(b) of Title 38, Section 3205's "sister" statute, which has been upheld against constitutional challenge solely on the basis that the affected veterans were living in public institutions and their needs were thus already satisfied at public expense. *See Ziviak v. United States,* 411 F.Supp. 416 (D.Mass.), *aff'd without opinion,* 429 U.S. 801,

97 S.Ct. 36, 50 L.Ed.2d 64 (1976); *United States v. Macioci,* 345 F.Supp. 325 (D.R.I.1972). Significantly, however, the VA itself has recognized that the primary basis for the holdings of *Macioci* and *Ziviak*—that the affected veterans were living in public institutions at public expense—is not available here because none of the veterans affected by Section 3205 are living in a public institution. *See* D'Alcomo Aff., Tab 14C at 85.

**28.** Section 3205 is designed so that it inevitably frustrates the testamentary decisions of mentally incompetent veterans without immediate dependents but with close family relatives. If an incompetent veteran desires to bequeath sums

such, the statute violates equal protection. *See Cleburne*, 473 U.S. at 450, 105 S.Ct. at 3259; *Bacon v. Toia*, 648 F.2d at 809.

## CONCLUSION

For the reasons set forth above, plaintiffs' motion, pursuant to Federal Rule of Civil Procedure 65, for an order preliminarily enjoining the defendant United States Department of Veterans Affairs from applying or enforcing Section 8001 of the Omnibus Budget Reconciliation Act of 1990, codified at 38 U.S.C. § 3205, is granted. Defendant's cross-motion, pursuant to Rules 12(b)(1) and (6), for an order dismissing the complaint for lack of subject matter jurisdiction and failure to state a claim upon which relief may be granted, or, alternatively, pursuant to Rule 12(c), for an order granting it judgment on the pleadings, is denied.

SO ORDERED.

to an adult child, sibling or friend for care provided to the veteran, Section 3205 intervenes, dictating that the veteran reduce the size of his or her estate or have all compensation payments cease. Competent disabled veterans, meanwhile, are free to accumulate compensation and otherwise augment their estates to whomever they select: friends, charities, churches, synagogues, clubs, political organizations, or, for that matter, trusts for the care of their favorite pets.