Willie WILLIAMS, Jr.

v.

John R. MANSON, Commissioner of
Correction et al.

Civ. No. H–79–713.

United States District Court,
D. Connecticut.

July 7, 1980.

Jon C. Blue, Legal Assistance to Prison-
ers, Hartford, Conn., for plaintiff.

Stephen J. O'Neill, Asst. Atty. Gen.,
Hartford, Conn., for defendants.

## ORDER

BLUMENFELD, District Judge.

The findings and recommendations of the
Magistrate are accepted.

## RECOMMENDED RULING

### FACTS

F. OWEN EAGEN, United States Magis-
trate.

Plaintiff, an inmate at the Connecticut
Correctional Institution at Somers, (herein-
after C.C.I.S.) alleges that defendants, the
Commissioner and two employees of the
Department of Corrections, have acted to
deprive him of rights secured to him by the
First and Fourteenth Amendments of the

United States Constitution. Specifically, plaintiff challenges the institution's mail room policy, which prohibits inmates from purchasing state weekly lottery tickets by subscription through the mails.[1] Under the prison's current policy, prisoner mail orders for lottery tickets are not approved and subscription applications or subscription lottery tickets sent to inmates from the Division of Special Revenue are returned to that center instead of being delivered. Plaintiff attacks this policy on three grounds. First, he argues that it deprives him of his First and Fourteenth Amendment rights because it abridges his freedom of speech in prohibiting his communication by mail. Second, he claims that it violates the Due Process Clause of the Fourteenth Amendment in depriving him of a property interest with no opportunity for a hearing. Third, plaintiff alleges that the policy violates the Equal Protection Clause of the Fourteenth Amendment because the prison, while prohibiting lottery purchase by mail, allows inmates to send money to their families, bankers, investment advisors, stockbrokers and others or to transfer funds for any legitimate purposes from their inmate accounts through the mails. Plaintiff does not seek money damages, but rather declaratory and injunctive relief against the defendants' policy.

Because we decide this case on equal protection grounds, we need not consider plaintiff's first amendment and due process claims.

## JURISDICTION

This court has jurisdiction under 28 U.S.C. § 1343(3) and (4) to consider plaintiff's claim for relief under 42 U.S.C. § 1983.

## LAW

1. *Standard of Review*

 The plaintiff claims that the prison policy which forbids his participation in the state lottery violates the Equal Protection Clause of the Fourteenth Amendment. Plaintiff alleges that this policy is unconstitutional because the prison allows inmates to correspond with bankers, stockbrokers or investment advisors and to transfer funds to and from their inmate accounts for other legitimate purposes, while it arbitrarily forbids receipt of incoming mail or transfers of money which would allow inmates to subscribe to the weekly lottery. We begin our analysis by recognizing that a prisoner need not allege the presence of a suspect classification or the infringement of a fundamental right in order to state a claim under the equal protection clause: such considerations merely affect the standard of review we must apply. *Durso v. Rowe*, 579 F.2d 1365 (7th Cir. 1978). In this case, since no suspect classification or fundamental right is at issue, the prison regulation banning lottery participation must be upheld if it "rationally furthers some legitimate, articulated state purpose." *McGinnis v. Royster*, 410 U.S. 263, 270, 93 S.Ct. 1055, 1059, 35 L.Ed.2d 282 (1973). We find that the state has in fact articulated a legitimate state purpose for its regulation: the need to maintain internal security and to protect the safety of inmates and staff within the prison. No less an authority than the United States Supreme Court has stated that internal security of a correction facility is central to the achievement of all other correction goals. *Pell v. Procunier*, 417 U.S. 817, 823, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). What remains to be considered is whether the regulation that has been challenged here bears a rational relation to the state's legitimate purpose. Because the resolution of this question depends to a great extent on the nature of this court's inquiry into prison policy, we take great care in articulating precisely the standard of review applied in this case.

---

1. Connecticut's Division of Special Revenue currently conducts three different lotterys, only one of which, "The Money Tree Lottery Subscription," is at issue here. This subscription lottery allows persons residing in Connecticut to play the weekly lottery by contracting in advance and purchasing a subscription to play the game for periods ranging from 12 weeks up to a year.

■ We begin with the proposition that the judgment of prison administrators must be accorded great deference by the judiciary given their expertise in dealing with the complex and difficult realities of running a penal institution. *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 126, 97 S.Ct. 2532, 2538, 53 L.Ed.2d 629 (1977). Thus, we follow the rule that "[w]here prison regulations are neither unreasonable nor arbitrary, the Federal Courts will not interfere with the administration of state prisoners." *Hill v. Estelle*, 537 F.2d 214, 215 (5th Cir. 1976).

In determining whether the challenged distinction is reasonable, the burden is not imposed upon the defendants to show that the prohibited practice is harmful; they need only demonstrate a rational basis for distinguishing between lottery participation on the one hand, and permissible financial transactions on the other. *Jones, supra*, 433 U.S. at 134, 136, 97 S.Ct. at 2542, 2543. Two recent Connecticut decisions which evaluated the reasonableness of Department of Correction regulations are particularly instructive here in setting forth the extent to which administrative policy distinctions must be supported by factual information in order to be deemed "rationally related" to a legitimate state purpose.

In *Beatham v. Manson*, 369 F.Supp. 783 (D.Conn.1973), an inmate challenged the Department of Corrections' use of different pay scales for inmate workers at two correctional institutions, Enfield and Somers, as violative of the Equal Protection Clause. It was undisputed that as a result of the department's policy, inmates transferred from Somers to Enfield would lose the job seniority which they had acquired by working at the former institution and as a result would receive a lower hourly wage for the work they performed after arriving at Enfield. The court held that the state's articulated purpose, "to encourage inmate incentive and industry" was legitimate, and also found a rational relationship between this purpose and the department's policy of utilizing different pay scales. Under the court's analysis, the wage differential was found to be rationally based since the more

desirable environment at Enfield would, in and of itself, provide an incentive to inmates, rendering unnecessary the compensation provided to inmates at Somers to encourage good behavior. *Beatham, supra* at 788.

In *Delafose v. Manson*, 385 F.Supp. 1115 (D.Conn.1974), on the other hand, the same court, in considering the same pay incentive program, found another of its distinctions to have no rational basis. In *Delafose*, inmates who had been transferred to a state mental institution challenged a department policy which provided that physically ill inmates being treated in hospitals would receive daily "hospital pay" while mentally ill patients transferred to state mental hospitals would not. Although the defendant in *Delafose* claimed to be effecting the same legitimate purpose articulated in *Beatham*, the court found the distinction between patients in regular hospitals and those in mental hospitals to be without a rational basis. In distinguishing *Beatham*, the court analyzed the reason articulated by the department for making its distinction: that it lacked jurisdiction and supervision over inmates in mental institutions, and found this contention to be unsupported by the evidence before it. *Delafose, supra* at 1120. Having found no facts which indicated a rational basis for the department's distinction, the court held that the policy which denied hospital pay to inmates of mental institutions was violative of the Equal Protection Clause of the Fourteenth Amendment. *Delafose, supra*, at 1121.

Applying the above analysis to the present case we must ask, based upon the evidence before us, whether the department's differential treatment of lottery participation as compared to other financial transactions has a rational basis, given the purpose of this policy as articulated by the defendants.

2. *Applying the "Rational Relationship" Test*

■ Persons desiring to subscribe to the Connecticut weekly lottery may do so by

requesting a "subscription application" from the State Commission on Special Revenue. The subscriber fills out the application, providing name, a Connecticut address, telephone and social security numbers and the number or numbers and colors he desires to play for periods of 12 to 52 weeks. The application and remittance are then mailed to the Commission, which in turn mails a "confirmation receipt" to the subscriber of records.[2] This receipt is nontransferable and has no objective value since it is not necessary to present the receipt to the Commission in order to receive any prizes. This is clearly indicated on the face of the receipt itself by the words

> [t]his receipt confirms that your name, numbers and Lucky Color have been recorded at the Connecticut Lottery. ... When you win, your prize money will be forwarded to you automatically ...

As indicated by the receipt, a "routine" winner, who may receive a prize of up to $1,000, is paid by means of a check issued and mailed to the name and address provided on the application. Winners of the "jackpot pool"[3] are contacted by telephone and given the option of picking up their checks in person at the commission office rather than receiving them by mail. To obtain checks in person, identification other than the confirmation receipt, usually a driver's license, is required. Subscribers have a third opportunity to win if they match the weekly Lucky Color. Such subscribers are automatically eligible for the weekly finalist drawing, which selects seven contestants to appear on television, one of whom will win a grand prize of up to $250,000. Finalists unable or unwilling to appear on the game show may designate a proxy to attend in their stead.

Plaintiff here, an inmate at C.C.I.S., sought to subscribe to the weekly lottery by requesting a subscription application by mail from the commission. Although the application was mailed to him as requested, it was intercepted by mail room personnel and returned by them to the commission. The plaintiff received a "rejection slip" stating that inmates were prohibited from subscribing to the lottery, and plaintiff's subsequent request for a hearing on this rejection was ignored.

In justifying its ban on lottery participation as a means of maintaining internal security and ensuring the safety of inmates and staff, the defendants stress the effect which lottery participation would have on the prison economy. Because inmates have so little money available to them,[4] and because lottery tickets could be expected to be an attractive commodity, defendants contend that the availability of such tickets would encourage inmates to engage in prohibited activities such as drug running in order to raise money for subscription purchases. Defendants also argue that one inmate could take advantage of the availability of gift subscriptions to the lottery to pressure a second inmate to purchase such a gift to the first party's benefit. Finally, defendants contend that if lottery participation were allowed the confirmation receipts returned to subscribers, regardless of their actual value, would be perceived as valuable and would therefore threaten the security of the facility.

Based on the evidence presented, we are of the opinion that none of the above considerations justifies the singling out of lottery tickets as a prohibited commodity. It is undisputed that the prison is intended to operate as a cashless society. Currency is treated as contraband and under the rules of the institution can be confiscated and transferred to an inmate welfare fund. Prisoners are able to purchase a variety of

---

**2.** An individual desiring to purchase a subscription as a gift can do so by providing the donee's name, address, etc., thereby making that person the subscriber of record.

**3.** Each week a winning 6–digit number is picked, and ticket holders who can match this number share the jackpot pool, which contains a minimum of $20,000. An additional $20,000 is added to the pool each week that no winning 6 digit number is sold, yielding an average per person prize of $25,000 to $30,000.

**4.** It is estimated that 46% of the inmates at Somers are indigent; that is, they have less than $5 in their inmate accounts.

items, including food, cigarettes, toilet articles, magazines, clothing, radios and television sets, from the prison commissary or from a mail order catalog. They can also send or receive funds through the mail to and from permitted persons outside the institution. Such transactions are accomplished through a procedure of debiting or crediting inmate institutional accounts, a process which requires inmates to request money orders from the inmate account office in order to release funds. Inmate purchases from the commissary or mail order catalog are limited to $20 per week, except for "special" items such as radios, televisions or magazine subscriptions. Inmates may receive money from anyone on their visiting lists and can send money to anyone outside the institution. No limit is imposed upon the amount of funds spent in this manner nor is the frequency of such transactions regulated: only where some indication of illicit activity appears are such transactions questioned.

Given that the above transactions are currently permitted within the prescribed limits, we see no way in which the defendants' ban on lottery participation can be rationally related to the maintenance of internal security. Any one of the commodities now available to prisoners might be subject to the same abuses which the defendants claim would result from lottery participation. Despite defendants' contention that allowing the purchase of lottery tickets would pose special problems because of the inherent "attractiveness" of these items, we see nothing which would justify singling out lottery tickets as a threat to prison security. Even if we were to agree that the confirmation receipts might appear valuable to inmates–a doubtful supposition given the clear language on the face of these receipts–the same is true of magazines, televisions, food items and any one of the other commodities which can legally be purchased by inmates. Even affording the defendants the deference traditionally given to prison administrators, as experts in their field, we have found "substantial evidence in the record to indicate that the officials have exaggerated their response to

[security] considerations," *Pell v. Procunier*, 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 35 L.Ed.2d 282 (1974), and therefore must reject defendants' ban on lottery participation.

Defendants have advanced a secondary justification for their prohibition against lottery subscriptions: the additional administrative burden which such transactions would impose upon mail room personnel. But administrative considerations alone, like budgetary considerations, cannot justify discriminatory treatment which is otherwise not rationally related to a legitimate state purpose. *See Delafose v. Manson*, 385 F.Supp. 1115 (D.Conn.1974).

Thus, we find that defendants' prohibition against lottery participation by inmates at C.C.I.S. constitutes a violation of the Equal Protection Clause of the Fourteenth Amendment. Accordingly, the defendants are permanently enjoined from prohibiting lottery subscription on the part of inmates, except on a case–by–case basis insofar as such participation contravenes other existing C.C.I.S. regulations.

Dated at Hartford, Connecticut, this 19th day of June 1980.