**Jessie M. HATCH, Plaintiff–Appellant,**

v.

**Sharon SHARP, Director of Illinois State Lottery, Steve Clark, Kenneth McGinnis and Salvador A. Godinez, Defendants–Appellees.**

No. 89–2033.

United States Court of Appeals, Seventh Circuit.

Submitted Oct. 15, 1990.

Decided Dec. 11, 1990.\*

---

\* After preliminary examination of the briefs, the court notified the parties that it had tentatively

Jessie M. Hatch, pro se.

William H. London, Dan Softcheck, Asst. Attys. Gen., Office of the Atty. Gen., Chicago, Ill., for defendants-appellees.

Before CUMMINGS, and POSNER, Circuit Judges, and PELL, Senior Circuit Judge.

CUMMINGS, Circuit Judge.

Jessie M. Hatch is an inmate at Menard Correctional Center, Menard, Illinois, and he wants to play the lottery. In February of 1988, Hatch wrote a letter to defendant Sharon Sharp, Director of the Illinois State Lottery, requesting an application to play the lottery by mail subscription.[1] Defendant Steve Clark, who was the supervisor of the licensing/subscription department of the Illinois State Lottery, denied Hatch's request on the basis that Illinois Department of Corrections (IDOC) Rules prohibited inmates from playing games of chance unless approved by the IDOC.

Hatch then sought permission to play the lottery from defendant Salvador A. Godinez, the assistant warden at Stateville Correctional Center (Stateville),[2] who denied Hatch's request, explaining that he did not view the lottery subscription program as a business venture, but as gambling. At the time Hatch sought permission to play the lottery, IDOC Rule 302 defined gambling as

---

concluded that oral argument would not be helpful to the court in this case. The notice provided that any party might file a "Statement as to Need of Oral Argument." *See* Rule 34(a), Fed.R.App.P.; Circuit Rule 34(f). Appellant has filed a statement requesting oral argument. Upon consideration of that statement, the briefs, and the record, the request for oral argument is denied and the appeal is submitted on the briefs and record.

1. Under the lottery subscription program, a player selects two sets of numbers for a minimum of 26 and a maximum of 104 weeks and sends a check with the selected numbers to the lottery. The player then receives a confirmation receipt which expressly states that it has no value and is not negotiable.

2. Hatch was incarcerated at Stateville before his transfer to Menard.

Operating or playing a game of chance or skill for anything of value, making a bet upon the outcome of any event, or possessing any gambling device. This section does not include the participation in a lottery or contest conducted by the United States, the State of Illinois, or any local governmental unit in this State, as authorized by the institution.

20 Ill.Admin.Code, 504A, Rule 302. However, in June of 1988, Rule 302 was changed and defined gambling as

Operating or playing a game of chance or skill for anything of value, making a bet upon the outcome of any event, or possessing any gambling device.

The reference to the lottery was simply dropped.

On June 24, 1988, Hatch filed a civil rights complaint under 42 U.S.C. § 1983, alleging that the defendants violated his constitutional rights to due process and equal protection by denying him the opportunity to play the lottery by mail subscription. After a two-day bench trial, in which Hatch ably proceeded *pro se*, the district court entered judgment in favor of the defendants. The court found that the defendants had demonstrated that the ban on lottery participation was reasonably related to the legitimate penological concerns of safety and security. Hatch appealed.

Hatch contends that the defendants violated his right to equal protection by allowing inmates to send money out of the prison to family or financial advisors to purchase stocks, bonds and notes, to hold bank accounts, to own real estate, and to purchase valuable items from the prison commissary,[3] but by not allowing inmates to play the lottery, which Hatch loosely equates with such business transactions. Hatch relies on *Williams v. Manson,* 499 F.Supp. 773 (D.Conn.1980), a case on all fours, in which the district court found an equal protection violation. As in this case, the prison involved in *Williams* operated as a cashless society. The inmates' wages from prison jobs and any money sent from outside sources were credited to an inmate trust account. Purchases from the prison commissary were debited from the account. For business transactions, the prison would send a money order, debiting the inmates' accounts. In *Williams,* there was no limit on the frequency or amount of such business transactions. As in this case, the prison asserted the security and safety concerns that lottery participation would undermine the prison economy by encouraging illicit activity and extortion and would further threaten security in that the confirmation receipts would be perceived as valuable.

The *Williams* court concluded that the lottery prohibition was not rationally related to the maintenance of internal security, but was an exaggerated response to security concerns. *See id.* at 777. The court noted: "Any one of the commodities now available to prisoners might be subject to the same abuses which the defendants claim would result from lottery participation." *Id. Williams* assumes, without expressly saying, that playing the lottery can be equated with investing in the stock or bond market, permissible business transactions. Our initial reaction is that this assumption is faulty. Arguably, investing in the stock market involves an informed decision based on the issuer's prospectus, financial disclosure and an assessment of market factors. In contrast, all the lottery requires is a dollar and a pick of two sets of numbers chosen by the player according to no more a scientific basis than that they are "lucky" or someone's birthdate or randomly by a computer. On further reflection, however, we note that it can be persuasively argued that a person could choose a "winning" stock portfolio by casting darts at the financial pages in the Wall Street Journal.

■ Assuming that playing the lottery can be equated with other financial or business transactions, we must determine whether the prison regulation defining gambling infringes on Hatch's right to

---

**3.** Hatch does not cite any prison regulation that allows inmates to engage in such transactions; however, the assertion is not disputed.

equal protection.[4] That is, we must determine whether the prohibition is rationally related to the penological interests offered to justify it. *See Illinois Health Care Ass'n v. Illinois Dep't of Public Health,* 879 F.2d 286, 288 (7th Cir.1989) (unless rule implicates suspect classification or fundamental right, only question is whether rule is rationally related to legitimate state interest). Hatch contends that *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), provides the applicable standard of review. In this case, however, the substantive right underlying Hatch's equal protection claim is a "right" to play the lottery. This is not a fundamental constitutional right and does not involve a suspect class; consequently, the *Turner* analysis is inapplicable. *See Turner,* 482 U.S. at 89, 107 S.Ct. at 2261 ("[W]hen a prison regulation impinges on inmates' *constitutional* rights, the regulation is valid if it is reasonably related to legitimate penological interests."); *see also Williams v. Lane,* 851 F.2d 867, 881 (7th Cir.1988) (rational basis test applies to equal protection claim of unequal treatment among inmates), *cert. denied,* 488 U.S. 1047, 109 S.Ct. 879, 102 L.Ed.2d 1001 (1989).

Defendant Godinez identified a number of security problems that gambling creates. One security concern was that an inmate who held a subscription could use that subscription as an item to barter with other inmates, undermining the control prison officials exercise through control of the restricted prison economy. Inmates receive "state pay" from the IDOC for working in the prison industries or for attending school. Inmates may use this state pay to purchase necessities that the prison does not provide such as soap and other toiletries, amenities such as coffee and snacks, and other "luxury items" such as radios, televisions and watches, all of which are available in the prison commissary. By controlling pay and the availability of basic

services and necessities, prison officials attempt to maintain some control over the inmates. Each new item of personal property introduced into the economy dilutes this control. If an inmate spends all or a substantial part of his pay on the lottery, he might then find himself in a position of having to resort to stealing from other inmates to get these items.

A second concern was that allowing inmates to play the lottery would fuel gang activity. If a gang were to extort money from an inmate to fund its lottery investments, Godinez testified that this would put the inmate at the mercy of the gang to receive basic necessities, thereby further removing control from the prison officials. Godinez also added that the confirmation receipts would be one more item for inmates to steal and to fight over.

A safety concern was that an inmate who held a subscription could become a target of the extortionate demands of other inmates. This, in turn, could lead to an increase in requests by targeted inmates to be placed in protective custody. Officials also opined that the increased volume of mail would create security problems. By prohibiting inmates from holding subscriptions, prison officials could avoid these problems.

■ Hatch argues that these problems already exist because of other commodities inmates are allowed to have; consequently, Hatch argues that there is no rational reason for permitting inmates to have these other items, but not to be able to hold subscriptions to the lottery. The *Williams* court found this argument persuasive. We believe that followed to its logical conclusion, it would unnecessarily restrict prison officials in the exercise of their discretion. Once prison officials allow inmates to have some personal property or to engage in some financial transactions, they should

---

**4.** We doubt that Hatch has raised a valid equal protection claim. Equal protection addresses differential treatment among groups or classes of people who are similarly situated. Hatch does not allege that prison officials are treating one group of inmates differently than another. Prison officials permit all inmates to invest and to send money out of the prison, to hold bank accounts and to possess valuable items from the commissary. Hatch does not allege that prison officials permit some inmates to play the lottery, but not others. Thus there is no differential treatment upon which to base an equal protection claim.

not be powerless to draw a line. We think it clear that such decisions to set limits are well within prison officials' discretion. The prison's objectives of safety and security are legitimate ones, and there is a valid connection between prohibiting inmates from participating in the lottery and the problems such a prohibition would avoid.

Despite the prison's prohibition on playing the lottery, inmates may still play through someone on the outside. Prison officials testified that they were powerless to stop an inmate from requesting that a check be drawn on his prison account and sent to a friend or relative who could then procure a subscription for the inmate. Hatch contends that this is evidence that the prohibition is unreasonable. We disagree. Just because prison officials are unable to stop an activity completely, *e.g.,* gang activity, drug dealing, or gambling, does not mean that they must condone or facilitate it. The prohibition against playing the lottery is rationally related to legitimate safety and security concerns.

■ Hatch also contends that the defendants violated his right to due process. He argues that Rule 302 created a liberty interest in being able to play the state lottery. To determine whether the prison officials' action violated Hatch's right to due process, it is necessary to determine whether IDOC Rule 302 created a liberty interest. Hatch notes that prior to its amendment, Rule 302 expressly excepted playing the lottery from its definition of gambling and that in the amended version, playing the lottery was not excepted from the definition. It is unnecessary to decide which version controls because neither one created a liberty interest. Even before it was amended, Rule 302 did not contain any substantive predicates to govern prison officials in deciding whether to permit inmates to play the lottery, nor did it mandate that inmates be allowed to play. It provided: "This section [defining what constitutes prohibited gambling] does not in-

clude the participation in a lottery or contest ... *as authorized by the institution.*" 20 Ill.Admin.Code 504A, Rule 302 (emphasis added). Unamended Rule 302 did not create a liberty interest by merely stating that the lottery was not included in the definition of gambling since it was left up to prison officials to decide whether to authorize it. Because no liberty interest was ever created for playing the lottery, Hatch's due process claim must fail. *See Joihner v. McEvers,* 898 F.2d 569, 571, 572 (7th Cir.1990).

For these reasons, the judgment of the district court is

AFFIRMED.