Spavone v. N.Y. State Dep't of Corr. Servs.

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

August Term 2012

(Argued: September 19, 2012          Decided: June 20, 2013)

No. 11-617

_____

STEVEN SPAVONE,
*Plaintiff-Appellee,*


-v.-


NEW YORK STATE DEPARTMENT OF CORRECTIONAL SERVICES, BRIAN FISCHER, Commissioner (DOCS), NICK CHALK, Temporary Release Chairman (WCF), DEBORAH JOY, Director Temporary Release (DOCS), *Defendants-Appellants.*

_____

Before:          LEVAL, KATZMANN and LIVINGSTON, *Circuit Judges.*


Appeal from an order of the District Court for the Southern District of New York (Patterson, *J.*), denying Defendants' motion for summary judgment. The individual Defendants-Appellants contend they are entitled to qualified immunity in connection with Plaintiff-Appellee's claim for money damages pursuant to 42 U.S.C. § 1983, a claim stemming from alleged violations of Plaintiff-Appellee's Equal Protection and Eighth Amendment rights. We hold that the facts shown by Plaintiff-Appellee do not support a finding that a reasonable public official would have known that the conduct challenged here violated clearly established rights. The individual Defendants-Appellants are therefore entitled to qualified immunity as a matter of law.

REVERSED and REMANDED.

BENJAMIN N. GUTMAN, Deputy Solicitor General (Cecelia C. Chang, Assistant Solicitor General, *on the brief*), *for* Eric T. Schneiderman, Attorney General of the State of New York, New York, NY, *for Defendants-Appellants*.

HANNAH Y.S. CHANOINE, Mayer Brown LLP, New York, NY, *for Plaintiff-Appellee*.

DEBRA ANN LIVINGSTON, *Circuit Judge*:

This case concerns how the New York State Department of Correctional Services[1] ("DOCS") determines when an inmate receives temporary medical leave from prison for the treatment of mental illness. Plaintiff-Appellee Steven Spavone ("Spavone") requested a leave of absence from prison in order to obtain additional treatment for his post-traumatic stress disorder ("PTSD"). DOCS officials Brian Fischer, Deborah Joy, and Nick Chalk (collectively, with DOCS, "Defendants-Appellants") denied his request. Spavone then brought suit under 42 U.S.C. § 1983 and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*., alleging, among other things, that Defendants-Appellants' denial of his leave request violated his Fourteenth Amendment right to equal protection of the law and his Eighth and Fourteenth Amendment right to be free of cruel and unusual punishment. In a January 21, 2011 opinion and order, the District

---

[1]We note that after this case began DOCS merged with the New York State Division of Parole to form the Department of Corrections and Community Supervision ("DOCCS"). We will refer to the Department as it was named when the underlying events of this case took place.

2

Court for the Southern District of New York (Patterson, *J.*) denied Defendants-Appellants' motion for summary judgment.

Fischer, Joy, and Chalk, the individual Defendants-Appellants, argue on appeal that the district court erred in rejecting their contention that they are entitled to qualified immunity from Spavone's § 1983 claims as a matter of law. We agree, and now reverse the district court's decision.[2]

## BACKGROUND

*1. Factual Background*

New York, like many states, allows some of its inmates to obtain temporary release from prison. Sections 851 through 861 of the New York Correction Law provide for several types of temporary release. Relevant here, a "leave of absence" permits an inmate to leave prison in order to visit a dying relative, attend a relative's funeral, or receive absolutely necessary medical treatment. N.Y. Correct. Law § 851(6). The Correction Law specifies that a medical leave of absence ("MLOA") is available for the period of time necessary for an inmate

> to undergo surgery or to receive medical or dental
> treatment not available in the correctional institution

[2]Though DOCS is listed in both the case caption and Defendants-Appellants' notice of appeal as an additional party to the appeal, the Defendants-Appellants have not raised any argument here as to whether DOCS is entitled to sovereign immunity. Accordingly, we do not consider the district court's denial of summary judgment insofar as it applies to DOCS on this interlocutory appeal.

> only if deemed absolutely necessary to the health and well-being of the inmate and whose approval is granted by the commissioner or his designated representative.

*Id.* § 851(6)(c). Regulations promulgated by DOCS reiterate this standard. *See* N.Y. Comp. Codes R. & Regs. tit. 7, § 1900.3(a)(3).

DOCS regulations establish the procedure for obtaining temporary release. *See* N.Y. Correct. Law § 852; N.Y. Comp. Codes R. & Regs. tit. 7, §§ 1900.1 *et seq*. Each correctional facility with inmates that could qualify for temporary release must have a three-member "temporary release committee" to review applications. N.Y. Comp. Codes R. & Regs. tit. 7, § 1900.2(a). Inmates apply to the committee by completing a form that states the type of temporary release they seek and their reasons for applying. *Id.* § 1900.4(a). After an inmate applies, a prison official checks the inmate's file and interviews him or her to ensure that the inmate is "statutorily or otherwise eligible for temporary release." *Id.* § 1900.4(b), (c). Besides meeting the standard established in § 851, an inmate seeking a leave of absence typically must, among other requirements, be within two years of parole eligibility and not be currently committed for certain violent offenses. *Id.* § 1900.4(c). The inmate's application must also receive a sufficiently high score based on a point system that takes into account factors such as criminal history and behavior while incarcerated. *Id.* § 1900.4(e).

4

For medical leaves of absence, the Commissioner may waive these non-statutory eligibility requirements. *Id.* § 1900.3(a)(3). But temporary release of any sort is apparently rare within New York's correctional system. In 2008, for example, DOCS granted only 19 leaves for a prison population of over 60,000.

Mental health treatment in the New York correctional system is provided by the New York State Office of Mental Health ("OMH"), a state agency charged by law with providing such care. *See* N.Y. Correct. Law § 401. A Memorandum of Understanding ("MOU") between OMH and DOCS establishes the various levels of care that OMH is obligated to offer within different DOCS facilities. At some prisons, mostly maximum security, OMH provides a "satellite unit" that employs a full-time psychiatric staff. Satellite units provide crisis treatment programs with 24-hour observation, outpatient services, and "intermediate care programs." MOU at 2–5. Outpatient services include "individual and group therapy and psychiatric services" that are "similar to mental health clinic services in the community." *Id.* at 4. Intermediate care programs provide patients with housing separate from the general prison population "similar to day treatment and residential programs which exist in the community." *Id.*

Pursuant to the MOU, DOCS and OMH "mutually agree upon the amount and level of mental health services required at each correctional facility." *Id.* at 2. In contrast to a satellite unit, at some prisons OMH operates a "mental

5

health unit" that staffs "[a] minimum of eight hours of psychiatric services a week" and provides outpatient services, but not crisis treatment or intermediate care programs. *Id.* at 5–6. Still other prisons afford fewer options. *Id.* at 6–9. Finally, OMH also provides in-patient services at the Central New York Psychiatric Center ("CNYPC"), a secure psychiatric hospital, for inmates requiring more intensive treatment. *Id.* at 17–18; *see also* N.Y. Correct. Law § 402. According to the MOU, "[i]nmates are assessed to determine the level of mental health services they will require and are assigned to facilities which have at least the identified level of services needed." MOU at 2.

Plaintiff-Appellee Spavone suffers from PTSD, which he attributes to two experiences. First, Spavone traveled to Nicaragua in the 1980s to join the Contra rebel forces and saw combat while fighting with them in that country's civil war. Second, Spavone worked on the scaffolding of a building across the street from the World Trade Center on September 11, 2001. Credited with risking his life to rescue several of his coworkers, Spavone witnessed victims of the attack jump from the towers. Symptoms of Spavone's PTSD include anxiety, headaches, and vivid nightmares and flashbacks.[3] Spavone takes several medications to treat the symptoms of his PTSD, and he claims that his PTSD greatly interferes with his daily functioning.

---

[3]In addition to PTSD, Spavone has also been diagnosed as suffering from depression.

Spavone was convicted in 2003 of one count of robbery and four counts of attempted robbery in the first degree. He received ten-year concurrent sentences on all counts. From 2005 to 2007, Spavone was incarcerated at Eastern Correctional Facility ("Eastern"), a maximum-security prison with a mental health unit. In 2007 he was transferred to Woodbourne Correctional Facility ("Woodbourne"), a medium-security prison that also contains a mental health unit. Spavone was released from prison in 2011.

While he was at Eastern, Spavone received treatment for his PTSD from a psychologist, Dr. Edward Rudder ("Rudder"), and a psychiatrist, Dr. Venkateswara R. Inaganti ("Inaganti"). Spavone's treatment at Eastern included both psychiatric medication and group and individual therapy sessions. When Spavone learned that he would be transferred to Woodbourne, he informed Rudder and Inaganti that he would soon be eligible for a medical leave of absence and asked them to write a letter in support.[4] The two sent a letter to Woodbourne dated April 27, 2007 in which they "strongly recommend[ed]" that Spavone obtain exposure therapy, cognitive behavioral therapy, and group therapy, without specifying where such treatment could or should be provided. They asserted only that these treatments, "especially if provided in a community inpatient program," would be of "great benefit" to Spavone.

[4]Spavone apparently believed that he was ineligible for medical leave until within two years of his anticipated release date.

7

Spavone was transferred in May 2007. According to him, Woodbourne did not initially provide him with the same level of care he had received at Eastern. Spavone's primary therapist was at first a social worker, not a psychologist,[5] and Spavone claims he was forced to organize his own group therapy sessions. After Spavone's transfer to Woodbourne and in response to Spavone's concerns about his PTSD treatment there, Dr. Al Shimkunas ("Shimkunas"), CNYPC's Chief Psychologist for Outpatient Services, interviewed Spavone, reviewed his diagnostic test results, and conducted a full psychological evaluation of him.

In August 2008 Spavone wrote to both Shimkunas and Dr. Donald Sawyer, CNYPC's Executive Director, from Woodbourne to elicit their assistance in obtaining temporary release. In a letter dated September 2, 2008, Shimkunas responded on behalf of both of them. Shimkunas noted that while Spavone's correspondence "implies that Central New York Psychiatric Center and Office of Mental Health Staff recommend that you be given temporary release in order to pursue further treatment in a residential program," this was not a recommendation that Shimkunas and Sawyer were "at liberty to make." Shimkunas continued, however, that they strongly recommended that Spavone's treatment continue and Shimkunas stated they were willing to "indicate that

[5]Spavone did eventually receive cognitive therapy from a psychologist while at Woodbourne.

8

treatment in a community residential or inpatient program [could] be of great benefit" to Spavone. Shimkunas further noted that the treatment Spavone was receiving at Woodbourne "has proved to be an effective treatment for [PTSD], including for patients who are incarcerated."

Shimkunas thereafter wrote a letter to Defendant-Appellant Joy, the Director of Temporary Release Programs for DOCS, informing her that Spavone had been treated by OMH staff for his PTSD since 2004, that his current treatment included both psychiatric medication and cognitive behavioral therapy, and that Spavone was receiving "evidence-based therapeutic interventions . . . designed to reduce the intensity of his emotional distress." The letter further noted that Spavone was applying for a medical leave of absence. Shimkunas explained:

> Mr. Spavone's request for medical leave of absence in a community inpatient or residential trauma treatment program represents a continuation of his desire to resolve the effects of his traumatic experiences. Treatment effectiveness in such a program as in his current therapy depends on his intrinsic motivation to address painful memories which is essential for a successful outcome. Inpatient hospitalization at Central New York Psychiatric Center is not indicated for his degree of psychiatric disability, as he does not suffer from a psychotic disorder and he is not a danger to himself.

Joy responded to Shimkunas with a letter stating that a leave of absence is available to seek medical treatment "not available in the correctional institution

9

only if deemed absolutely necessary to the health and well being of the inmate." She explained that Spavone "would not appear to meet this statutory definition," but that "if and when he applied, his application [would] be evaluated." Joy concluded by stating that "[i]n the mean time, I hope that Spavone continues to avail himself of mental health services available in general confinement."

Spavone applied for a leave of absence directly to Defendant-Appellant and then-DOCS Commissioner Fischer on September 11, 2008. After Fischer's office informed Spavone that he had to apply at the facility where he was incarcerated, Spavone submitted an application to the temporary release committee at Woodbourne, which was headed by Defendant-Appellant Chalk. Spavone's stated reason for seeking a leave of absence was "[t]o obtain a community based residential/inpatient program to provide essential medical care that cannot be provided to me while or during my incarceration for PTSD." Spavone's application, however, did not include material from a medical provider indicating that Spavone's ongoing PTSD treatment was ineffective, nor did Spavone's application identify either the community program he proposed to attend or the form of PTSD treatment currently unavailable to him but "absolutely necessary" to his care. The temporary release committee denied Spavone's application on the ground that his violent and recidivist history, including "the instant offense

with 4 counts of robbery 1st in which you robbed the proprietor at gunpoint," meant his release posed a risk to the community.[6]

Spavone appealed the denial of medical leave to Joy, and attached to the appeal his correspondence with Drs. Shimkunas, Rudder, and Inaganti, as well as a letter from a residential treatment facility providing him with information about its program and inviting him to apply.  On November 24, 2008, Joy denied the appeal, explaining:

> After careful review and consultation with NYSDOCS counsel's office there are no provisions in the temporary release rules and regulations that allow a medical leave of absence for mental health reasons.  Therefore your current application for a medical leave of absence is denied based on eligibility criteria.

After Spavone asked for reconsideration of his appeal, Joy wrote in a letter that "the requested purpose did not meet statutory criteria for MLOA."  She further explained to Spavone, "MLOAs are considered for medical treatment not available in the facility.  Your request was for an OMH placement.  You are receiving OMH services at your facility and are encouraged to continue these services."  Joy later explained in an affidavit that her decision was based on the "understanding that all of an inmate's mental health care needs are met in the correctional facility setting through the comprehensive services provided by

---

[6]Spavone maintained before the district court that the robbery and attempted robberies of which he was convicted were nonviolent and committed with a toy gun.

11

OMH," and that "[n]othing in the papers submitted in connection with plaintiff's application raised a substantial challenge to that understanding."

*2. Procedural History*

Spavone filed a complaint in the Southern District of New York on January 5, 2009, naming DOCS, Fischer, Joy, and Chalk as defendants. Spavone sought damages under 42 U.S.C. § 1983 for alleged violations of the Eighth Amendment and of the Equal Protection and Due Process Clauses of the Fourteenth Amendment, as well as for alleged violations of the ADA. DOCS and the individual Defendants-Appellants moved for summary judgment on June 14, 2010.

In a January 21, 2011 opinion and order, Judge Patterson denied the motion for summary judgment, rejecting, *inter alia*, the individual Defendants-Appellants' claim that they are entitled to qualified immunity. He explained that "[a] decision denying participation in the [temporary release program] on the ground that the statute, N.Y. Correction Law 851(6), and the regulations do not mention mental health care as distinguished from medical care . . . discriminate[s] against inmates suffering from mental health issues such as PTSD." *Spavone v. N.Y. State Dep't of Corr. Servs.*, No. 09-cv-969, 2011 WL 253958, at *5 (S.D.N.Y. Jan. 21, 2011). Judge Patterson concluded that Spavone had raised three issues of material fact: (1) "whether the mental health

treatment [Spavone] seeks is 'deemed absolutely necessary to the health and well-being of the inmate' as provided in 7 NYCRR 1900.3(a)(3)"; (2) "whether the present practices and policies of DOCS are being administered in accordance with the purposes of Section 851 and regulations which DOCS itself adopted"; and (3) "whether, under the present regulations of DOCS, MLOA is not available for mental health treatment even if it is absolutely necessary to the 'health and well being' of persons such as the Plaintiff." *Id.* at *5–6.

Defendants-Appellants timely appealed.

## DISCUSSION

*1. Jurisdiction*

Denials of motions for summary judgment are typically not "final decisions" appealable under 28 U.S.C. § 1291. An exception exists for denials of summary judgment motions premised on qualified immunity, which are appealable under the collateral order doctrine. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). This is because qualified immunity entails "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Id.* at 526.

The collateral order doctrine, however, only permits appellate review of a "'claim of right separable from, and collateral to, rights asserted in the action.'" *Id.* at 527 (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546

13

(1949)) (internal brackets omitted). For this reason, appellate courts may review denials of claims of qualified immunity "only to the narrow extent they turn on questions of law." *Bolmer v. Oliveira*, 594 F.3d 134, 140 (2d Cir. 2010). While an appellate court may reconsider a district court's determination that an issue is material, it may not reconsider the district court's determination that an issue is genuine. *Id.* at 140–41. The result is that we may find that defendants are entitled to qualified immunity only "on stipulated facts, or on the facts that the plaintiff alleges are true, or on the facts favorable to the plaintiff that the trial judge concluded the jury might find." *Salim v. Proulx*, 93 F.3d 86, 90 (2d Cir. 1996). The reasonableness of a defendant's actions, however, remains a question of law, so long as the underlying facts are undisputed. *See Winfield v. Trottier*, 710 F.3d 49, 53–54 (2d Cir. 2013).

The district court below found three genuine issues of fact. First, the district court found a genuine issue as to whether a leave of absence was "absolutely necessary to the health and well being" of Spavone. Second, it found an issue as to whether DOCS's practices and its policies concerning leaves of absence were "being administered in accordance with the purposes of Section 851" and DOCS's own regulations. Third, the district court found an issue as to whether DOCS's policies would ever allow a leave of absence for mental health treatment, even when that treatment was absolutely necessary for the health

14

and well being of the applicant. We must accept these findings as true for purposes of this appeal.

For issues that do fall within our jurisdiction, we review the district court's denial of summary judgment *de novo*. *See Amore v. Novarro*, 624 F.3d 522, 529 (2d Cir. 2010); *Bolmer*, 594 F.3d at 141. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court construes all evidence, draws all inferences, and resolves all ambiguities in favor of the non-moving party. *See, e.g.*, *Novarro*, 624 F.3d at 529.

*2. Spavone's Constitutional Claims*

Spavone alleges that Defendants-Appellants Fischer, Joy, and Chalk violated two of his constitutional rights: his right to equal protection of the laws under the Fourteenth Amendment, and his right to be free of cruel and unusual punishment under the Eighth and Fourteenth Amendments.[7] He argues on appeal that Defendants-Appellants violated these rights through "DOCS' policy of carving out mental health treatment from the statutory safety valve for necessary but unavailable medical treatment" under § 851(6). Appellee's Br. at

---

[7]Spavone's complaint also alleged a violation of his procedural due process rights, but he has abandoned that claim on appeal. Spavone's ADA claims are not before us on this interlocutory appeal.

15

24. Defendants-Appellants contend on appeal that they are entitled to qualified immunity.

Qualified immunity protects federal and state officials from both civil damages and "unnecessary and burdensome discovery or trial proceedings." *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998). It is "an affirmative defense that the defendants have the burden of raising in their answer and establishing at trial or on a motion for summary judgment." *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) (internal quotation marks omitted). Its purpose, as we have repeatedly said, is to serve the public good by shielding public officials from potentially disabling threats of liability. *See, e.g.*, *Novarro*, 624 F.3d at 530; *Provost v. City of Newburgh*, 262 F.3d 146, 160 (2d Cir. 2001); *see also Malley v. Briggs*, 475 U.S. 335, 341 (1986). Qualified immunity therefore extends to circumstances where an official's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," and applies "regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). So long as a defendant "has an objectively reasonable belief that his actions are lawful," he "is entitled to qualified immunity." *Swartz v. Insogna*, 704 F.3d 105, 109 (2d Cir. 2013) (internal quotation marks omitted).

Even assuming, *arguendo*, that on Spavone's version of the facts a reasonable jury could find a violation of his Fourteenth or Eighth Amendment rights, we conclude that the individual Defendants-Appellants are entitled to qualified immunity. *See Pearson*, 555 U.S. at 236. No reasonable jury could conclude, on the record here, that it would have been objectively unreasonable for a public official in the position of these Defendants-Appellants to believe that he or she was acting in a manner consistent with Spavone's rights to equal protection and to be free of cruel and unusual punishment. We therefore hold that individual Defendants-Appellants have qualified immunity from Spavone's constitutional claims.

A.  Personal Involvement of Nick Chalk

At the start, and even before reaching the merits of Spavone's claims, we first conclude that there is no genuine issue as to whether Defendant-Appellant Nick Chalk, the chairman of the temporary release committee at Woodbourne, was personally involved in the alleged violations of Spavone's constitutional rights. "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (internal quotation marks omitted). On appeal, Spavone premises his equal protection and cruel and unusual punishment claims on DOCS's alleged policy of denying

17

leaves of absence for absolutely necessary mental health treatment while affording such leaves for the provision of other absolutely necessary medical care. Chalk, however, denied Spavone's application due to Spavone's criminal history. It was only when Spavone appealed the committee's decision to Deborah Joy that he was told "there are no provisions in the temporary release rules and regulations that allow a medical leave of absence for mental health reasons."

We recognize (consistent with the district court's finding that a genuine issue of fact exists as to whether DOCS's present practices and policies "are being administered in accordance with the purposes of Section 851 and [DOCS's] regulations") that there may be a factual dispute as to whether Chalk followed proper procedure in evaluating Spavone's application for medical leave. Spavone, however, has not alleged before this Court that any failure by DOCS to comply with its own regulations was what denied him equal protection of the law or subjected him to cruel and unusual punishment. Rather, he focuses solely on the alleged policy of denying all leaves of absence for mental health treatment. Since there is no evidence that Chalk had any involvement in the promulgation or application of such a policy, he is entitled to qualified immunity.[8]

---

[8]We also have doubts about whether Commissioner Fischer had sufficient personal involvement in the alleged violation of Spavone's rights. While Fischer, as Commissioner of DOCS, was charged with promulgating the regulations that govern

18

## B. Equal Protection

We next conclude that, even accepting Spavone's version of the facts, Spavone has failed to raise a genuine issue as to whether a public official in the position of Fischer or Joy could reasonably have understood that his or her actions were consistent with Spavone's equal protection rights. Simply put, a reasonable jury could not deem such an understanding objectively *unreasonable* on the sparse record before this Court. In such circumstances, Fischer and Joy are entitled to the protection of qualified immunity. *See Farid v. Ellen*, 593 F.3d 233, 244 (2d Cir. 2010).

When a party challenges a government classification that does not involve a suspect class or burden fundamental rights, courts apply rational basis scrutiny. The classification will be constitutional so long as "there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Bryant v. N.Y. State Educ. Dep't*, 692 F.3d 202, 219 (2d Cir. 2012) (citing *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)). Challenged classifications are entitled to "a strong presumption of validity." *Beach*

---

temporary release, *see* N.Y. Correct. Law § 852, there is no evidence in the record that he was aware that Joy allegedly interpreted those regulations to not allow leaves of absence for mental health treatment. Still, out of an abundance of caution we decline to hold that there is no genuine issue as to whether Fischer was personally involved in the alleged constitutional violations. *See Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (listing the various situations in which a supervisory official may be liable for constitutional violations).

19

*Commc'ns*, 508 U.S. at 314–15. The party attacking a classification's rationality bears the burden "to negative every conceivable basis which might support it." *Armour v. City of Indianapolis,* 132 S. Ct. 2073, 2080–81 (2012) (internal citation and quotation marks omitted).

Spavone does not contend that a suspect group or fundamental right is involved in this case. Still, he urges us to apply the standard of review used in *Turner v. Safley,* 482 U.S. 78 (1987), which would invalidate any prison regulation "where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational," *id.* at 89–91. We disagree that *Turner* applies to this case. *Turner* involved prison regulations that were claimed to infringe upon both the fundamental right to marry and First Amendment freedom of speech. *Id.* at 83. The standard adopted by the Supreme Court was a compromise between the strict scrutiny standard that usually would apply to such constitutional claims and the "inordinately difficult undertaking" of running a prison. *Id.* at 84–85; *see also Shakur v. Selsky*, 391 F.3d 106 (2d Cir. 2004) (applying *Turner* to freedom of speech claim); *Benjamin v. Coughlin,* 905 F.2d 571 (2d Cir. 1990) (applying *Turner* to free exercise and religious discrimination claims). We thus join the Seventh Circuit in holding that *Turner* does not govern equal protection claims brought by prisoners that do not involve suspect groups or fundamental rights. *See Hatch v. Sharp*, 919

F.2d 1266, 1268–69 (7th Cir. 1990). This is consistent with our previous treatment of such claims. *See Benjamin v. Jacobson*, 172 F.3d 144, 165 (2d Cir. 1999) (en banc) (applying traditional rational basis review).

The district court determined that a genuine factual dispute exists as to whether DOCS's policies would ever permit a leave of absence for mental health treatment. Accepting this finding, as we must, the question on rational basis review at the summary judgment stage is clear: whether a reasonable jury could conclude that no reasonably conceivable set of facts could have provided a rational basis for DOCS to deny all medical leaves of absence for the treatment of mental illness, while affording such leaves (albeit in narrow circumstances) for other medical care. Fischer and Joy argue that at the time they acted on Spavone's application for medical leave, it was reasonably conceivable that all "absolutely necessary" mental health treatment was available within the New York correctional system pursuant to the MOU between OMH and DOCS.[9] They assert that this, in turn, permitted a rational distinction to be drawn between

---

[9]Fischer and Joy properly focus on the state of affairs existing at the time they acted on Spavone's application for medical leave. Spavone's equal protection claim seeks only money damages for a government classification that no longer applies to him. In the more typical equal protection case, where a party challenges a classification that applies to him or her, a court will ask what currently reasonably conceivable facts could provide a rational basis for the classification. *See, e.g.*, *United States v. Thomas*, 628 F.3d 64, 71 (2d Cir. 2010). In rational basis challenges to *past* classifications, however, such as the one here, we ask what facts were reasonably conceivable at the time of the classification. *See, e.g.*, *Cobb v. Pozzi*, 363 F.3d 89, 110 (2d Cir. 2004).

treatment for mental illness and other types of medical treatment not available in the prison system. Spavone contests this assertion.

We conclude that this is a question we need not reach. For even assuming, *arguendo*, that New York's alleged distinction between medical leave for physical ailments and mental illness could fail to survive even "highly deferential" rational basis review, *Hayden v. Paterson*, 594 F.3d 150, 170 (2d Cir. 2010), it is clear that Spavone has not raised an issue as to whether a public official in Fischer's or Joy's position could reasonably have believed that such a distinction passed constitutional muster. Even on Spavone's version of the facts, the arrangements between DOCS and OMH set forth in the MOU provided a basis for concluding that basic mental health treatment—including even residential programs (albeit secure ones) of the sort Spavone sought—was available within the correctional system. And Spavone—who conducted no discovery into how the MOU operates in practice—has not shown that either he or any other inmate presented Fischer or Joy with reason to believe that necessary mental health care was unavailable at any time, with regard to any inmate.

The district court found that a genuine issue exists as to whether the treatment sought by Spavone was, in fact, absolutely necessary to his health and well being, a finding that binds us here. This factual issue, however, does not provide a sufficient basis on which a jury could conclude that Fischer and Joy

22

could not reasonably have believed that DOCS's alleged policy had a rational basis. Even if Spavone was in need of absolutely necessary medical care, the record is clear that neither Fischer nor Joy had reason to conclude that such care was not available to him in prison. While Spavone stated in his application for medical leave that such leave was "to provide essential medical care that cannot be provided to me while or during my incarceration," he offered little to no information as to the nature of this care or his basis for deeming it essential. Moreover, none of the doctors who had treated or seen Spavone in prison (or any other doctors, for that matter) corroborated his claim that treatment outside prison was required. Indeed, Dr. Shimkunas affirmed in the correspondence submitted to Joy (and in response to Spavone's suggestion that he was unlikely to receive effective treatment while incarcerated) that the therapy being provided to Spavone at Woodbourne "has proved to be an effective treatment for [PTSD], including for patients who are incarcerated."

Simply put, the record reveals no basis on which to conclude that Fischer and Joy could not reasonably have believed, as Joy has affirmed, that the mental health needs of DOCS inmates were being met "in the correctional facility setting through the comprehensive services provided by OMH." This conclusion means that a reasonable public official in the position of Fischer or Joy could reasonably have believed there was a rational basis for distinguishing between

23

leaves of absence for the treatment of mental illness as opposed to other sorts of illness. And this conclusion, in turn, entitles Fischer and Joy to qualified immunity.

c. Eighth Amendment

A similar analysis governs Spavone's Eighth Amendment claim. The Eighth Amendment forbids "deliberate indifference to serious medical needs of prisoners," *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), which includes needs for mental health care, s*ee Langley v. Coughlin*, 888 F.2d 252, 254 (2d Cir. 1989). A deliberate indifference claim contains two requirements. The first requirement is objective: "the alleged deprivation of adequate medical care must be 'sufficiently serious.'" *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The second requirement is subjective: the charged officials must be subjectively reckless in their denial of medical care. *Id.* at 280. This means "that the charged official [must] act or fail to act while *actually aware* of a substantial risk that serious inmate harm will result." *Id.* (emphasis added). Officials need only be aware of the risk of harm, not intend harm. *Id.* And awareness may be proven "from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842.

Spavone's version of the facts raises no genuine issue as to this second, subjective element, because there is no evidence that Fischer or Joy thought that

24

denying Spavone's request for a leave of absence would cause him serious harm. Though Spavone stated in his application that he was seeking "essential medical care," he never stated what that care was. Moreover, the letters accompanying Spavone's application did not suggest that he would be seriously harmed if not afforded a medical leave. Based on these letters, Joy had no reason to doubt that Spavone was receiving effective treatment at Woodbourne, much less to think that he would face serious harm if not granted access to outside mental health treatment. Fischer, whose only interaction with Spavone was to instruct Joy to inform Spavone that he had to apply for a leave of absence at the facility where he was incarcerated, would have had even less reason to know of any risk of harm. Nor did the materials Spavone sent to Fischer suggest a more obvious risk of harm to Spavone than did the materials Spavone sent to Joy.

The district court's determination that a genuine issue exists as to whether a leave of absence is "not available for mental health treatment even if it is absolutely necessary to the 'health and well being'" of the inmate does not significantly change this analysis. Spavone argues that "Ms. Joy's apparent unwillingness to make an individualized determination in light of the policy" renders "her awareness of risk . . . a proper jury question." Appellee's Br. at 33. But there is no evidence that Fischer or Joy had actual knowledge that restricting leaves of absence for mental health treatment would cause serious

25

harm to inmates, nor is there a basis on which to conclude that the risk of harm was both substantial and obvious.

At any rate, we need not decide whether implementing a policy that categorically distinguishes between leaves of absence for mental illness and for other health-related needs might, on a different record, pose a risk of harm sufficiently obvious as to establish a defendant's subjective awareness of it. For on the record here, Spavone has failed to raise a genuine issue that Fischer or Joy knew that such a policy would cause him serious harm, much less harm so serious that it would be objectively unreasonable for them to believe that the policy was consistent with Spavone's right to be free of cruel and unusual punishment. This entitles Fischer and Joy to qualified immunity. *See McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004).

## CONCLUSION

For the foregoing reasons, we reverse the judgment of the district court, direct dismissal of the § 1983 claims against the individual Defendants-Appellants, and remand for further proceedings.

26